# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 17, 2009          Decided January 22, 2010

No. 08-1266

AMERICAN GAS ASSOCIATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA,
INTERVENOR

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*Andrew K. Soto* argued the cause and filed the briefs for petitioner.

*Kathrine L. Henry*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Cynthia A. Marlette*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Joan Dreskin*, *Timm L. Abendroth*, and *Daniel J. Regan Jr.* were on the brief for intervenor Interstate Natural Gas Association of America in support of respondent.

Before: HENDERSON, ROGERS, and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*:  The Federal Energy Regulatory Commission (FERC or the Commission) adopted extensive revisions to its financial forms and reporting rules for interstate natural gas pipelines.  However, the Commission declined to adopt petitioner's request for additional and more detailed reporting requirements for shipper-supplied gas for pipeline operations.  Petitioner, the American Gas Association (AGA)—a national trade association of gas utility companies—argues the Commission failed to engage in reasoned decisionmaking, offering only conclusory and unsupported explanations.  Because the Commission failed to respond to the reasonable concerns of a dissenting Commissioner, we grant the petition for review.

I

Pursuant to its authority to ensure "[j]ust and reasonable rates," 15 U.S.C. § 717c(a), the Commission has substantial discretion to prescribe rules and regulations concerning "annual and other periodic or special reports," and to determine "the manner and form in which such reports shall be made," *id.* § 717i(a).  FERC requires natural gas companies to file either FERC Form No. 2 (Form 2), Annual Report for Major Natural Gas Companies, 18 C.F.R. § 260.1, or FERC Form No. 2-A (Form 2-A), Annual Report for Nonmajor Natural Gas Companies, *id.* § 260.2.  All natural

gas companies also must file FERC Form No. 3-Q (Form 3-Q), Quarterly Financial Report of Electric Utilities, Licensees and Natural Gas Companies, *id.* § 260.300.

After determining a pipeline's existing rate is "unjust, unreasonable, unduly discriminatory, or preferential," FERC is authorized to change the pipeline's rates, either upon its own motion or in response to a complaint. 15 U.S.C. § 717d(a). The Commission relies on investigations and complaints under section 5 of the Natural Gas Act (NGA), *id.*, to monitor pipeline rates, especially since the Commission no longer reviews rates triennially, as it once did. *See Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations, and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, Order No. 636, Jan. 1991–June 1996 FERC Stats. & Regs. Preambles ¶ 30,939 (1992), *order on reh'g*, Order No. 636-A, Jan. 1991–June 1996 FERC Stats. & Regs. Preambles ¶ 30, 950 (1992), *order on reh'g*, Order No. 636-B, 61 FERC ¶ 61,272 (1992) (Order 636); *see also Complaint Procedures,* Order No. 602, 86 FERC ¶ 61,324, 1999 WL 177650, at *2 (1999) (noting "[c]omplaints enable the Commission to monitor activities in the marketplace and provide an early warning system for identifying potential problems"). FERC or the complaining customer has the burden of showing the existing rate or practice is unjust or unreasonable and that the rate proposed *is* just and reasonable. *See, e.g.*, *Transcon. Gas Pipe Line Corp. v. FERC*, 518 F.3d 916, 918 (D.C. Cir. 2008). Both rely on pipeline data reported on Forms 2, 2-A, and 3-Q as the basis for initiating section 5 complaints and satisfying their burden of proof. *See, e.g.*, *Pub. Serv. Comm'n of NY v. Nat'l Fuel Gas Supply Corp.*, 115 FERC ¶ 61,299 at 62,072 (2006); *Panhandle Complainants v. SW Gas Storage Co.*, 117 FERC ¶ 61,318 at 62,540, 62,542 (2006). If the

Commission or the complainant succeeds, FERC can order a new just and reasonable rate to replace the existing one. *See* 15 U.S.C. § 717d(a).

II

In February 2007, the Commission opened an inquiry to determine "whether the . . . annual and quarterly financial forms provide[d] sufficient information to the public to permit an evaluation of the filers' jurisdictional rates, and whether these forms should otherwise be modified to improve their usefulness." *Assessment of Information Requirements for FERC Financial Forms*, 118 FERC ¶ 61,108, 2007 WL 494954, at *1 (2007). Seven months later, the Commission proposed rules amending the financial reporting requirements of natural gas companies. *See Revisions to Forms, Statements, and Reporting Requirements for Natural Gas*, 72 Fed. Reg. 54,860 (proposed Sept. 20, 2007) (to be codified at 18 C.F.R. pts. 158, 260) (NOPR). The stated purpose of the proposed amendments was to "provide pipeline customers, state commissions, and the public the information they need to assess the justness and reasonableness of pipeline rates." *Id.* at 54,860. Noting the decline in section 4 filings since the elimination of triennial rate review, the Commission affirmed its reliance on section 5 complaints and concluded a section 5 complainant "must have access to the information needed to meet [the burden of proof]." *Id.* at 54,861. Specifically, the Commission determined the data on Forms 2, 2-A, and 3-Q "must be sufficient to support a complaint." *Id.*

Pipelines consume fuel when they operate equipment that transports gas through pipelines and in and out of storage facilities, but they also incur a certain amount of lost-and-unaccounted-for gas through leakage and meter errors. Years ago, FERC required interstate pipelines to "unbundle" the

transportation and sales components of their services and separately state the rates and charges for the services they provide. *See* Order 636. In the Commission's view, customers should only pay for the services they use. *See Panhandle Eastern Pipeline Co.*, 61 FERC ¶ 61,172 at 61,628 (1992). FERC generally allows pipelines to recover separately the cost of fuel used to provide various services by requiring customers to pay a fuel charge equal to a certain fuel retention percentage.

In an earlier proceeding FERC asked whether fuel cost recovery policies should be modified. *See Fuel Retention Practices of Natural Gas Companies*, 120 FERC ¶ 61,255, 2007 WL 2758903 (2007). The Commission found pipelines were retaining or carrying over enormous fuel costs ($711 million in 2005) beyond what was consumed, lost, or unaccounted for. *See id.* at *3. The Commission, however, declined to take any immediate action, instead stating it would rely on section 5 complaints from pipeline customers to monitor over-recovery. *Fuel Retention Practices of Natural Gas Companies*, 125 FERC ¶ 61,213, 2008 WL 4962560, at *3 (2008).

In the NOPR here, the Commission noted that with increased gas prices, the disposition of fuel has become an important component of pipelines' cost of transportation. *See* NOPR, 72 Fed. Reg. at 54,865–66. The Commission therefore proposed adding a new schedule to Forms 2, 2-A, and 3-Q (new pages 521a and 521b) requiring pipelines to report detailed information regarding the acquisition and disposition of shipper-supplied gas. *Id.* at 54,866. The new schedule, the Commission believed, would help users of the Forms more readily determine whether pipelines are over-recovering their revenue requirements. Under the proposed rule, pipelines would be required to report: (1) the difference

between the volume of gas received from shippers and the volume of gas consumed in pipeline operations each month; (2) the disposition of any excess gas and the accounting recognition given to such disposition, including the basis of valuing the gas and the specific accounts charged or credited; and (3) the source of gas used to meet any deficiency and the accounting recognition given to the gas used to meet the deficiency, including the accounting basis of the gas and the specific accounts charged or credited. *Id.* In addition, "in order to provide more clarity for gas purchase activity," the Commission also proposed requiring pipelines, which had previously only been required to report volumes of gas purchases in the aggregate, to report the volumes applicable to each of their gas purchase expense accounts. *Id.*

The Commission also acknowledged that additional reporting might be necessary to protect pipeline customers from cross-subsidization of discounted, negotiated, or recourse rates. *See*. *id.* at 54,867. Although FERC permits pipelines to discount their generally applicable rates where competitive market conditions warrant, *see* 18 C.F.R. § 284.10(c)(5); *see also United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1142 (D.C. Cir. 1996), and to negotiate individualized rates, *see Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines*, 74 FERC ¶ 61,076 (1996), FERC regulations restrict pipelines' ability to charge a different fuel rate than the generally applicable one established in the tariff. With respect to discounted rates, pipelines cannot discount the fuel use component unless they can demonstrate the relevant service does not use fuel. *See, e.g.*, *Ozark Gas Transmission, LLC*, 122 FERC ¶ 61,295, 2008 WL 825306, at *3 (2008). Moreover, under FERC's "negotiated rate" policy, pipelines cannot impose cross-subsidized fuel costs on their existing, non-negotiated rate customers. *See generally Alternatives to Traditional Cost-of-*

*Service Ratemaking for Natural Gas Pipelines*, 74 FERC ¶ 61,076. Instead, pipelines must bear the cost of any under-recovery of their costs themselves. *See Dominion Transmission, Inc. v. FERC*, 533 F.3d 845, 849 n.4 (D.C. Cir 2008). The Commission therefore proposed adding a new schedule requiring pipelines to report the revenues and volumes applicable to discounted and negotiated rate services. *See* NOPR, 72 Fed. Reg. at 54,867. The requirement, the Commission stated, would help customers identify the level of services provided under each rate schedule and thus protect them against cross-subsidization. *See id.*

In its comments, petitioner agreed the proposed reporting revisions would help parties assess whether pipeline rate and fuel charges remained just and reasonable. *See* Comments of the Am. Gas Ass'n at 3, Docket No. RM07-9-000 (Nov. 13, 2007). However, petitioner argued "greater clarity regarding gas purchase and sales activities can be achieved." *Id.* at 4. Petitioner therefore requested that the Commission also require the information on the new fuel schedule to be broken out by function (e.g., transportation, storage, gathering) and that pipelines be required to include, by function, the amount of fuel waived or reduced as part of a discounted or negotiated rate agreement. *Id.* at 5. This information, petitioner argued, was necessary to help customers determine whether pipelines were engaging in any inappropriate cross-subsidization. *Id.*

The Commission rejected petitioner's proposals, deciding instead to adopt only the new reporting requirements contained in the NOPR. *See Revisions to Forms, Statements, and Reporting Requirements for Natural Gas Pipelines*, Order No. 710, 73 Fed. Reg. 19,389 (proposed Mar. 21, 2008) (to be codified at 18 C.F.R. pts. 158, 260) (Order 710). In

response to petitioner's requests, the Commission stated that "[t]he information broken out by function (e.g., transportation, storage, gathering, etc.) sought by AGA is available in Form 2 at page 520," *id.* at 19,391–92; that "[t]he NOPR's proposals are designed to provide needed transparency but also to reflect a fair balance between the need for the information and the additional burden on the pipeline," *id.* at 19,392; and that "[w]e believe that the new schedules (pages 521a and 521b) proposed in the NOPR reflect this balance," *id.* Petitioner filed a timely request for rehearing; the Commission once again declined to require the additional information. *See Revisions to Forms, Statements, and Reporting Requirements for Natural Gas Pipelines*, 123 FERC ¶ 61,278 at 62,702 (2008) ("Order 710-A," and, together with Order 710, the "Orders"). The Commission balanced the need for greater transparency with the additional burdens placed on pipelines, *id.* at 62,704, and decided the exclusion of the additional data sought by petitioner would not "preclude the Commission's or customers' ability to assess the justness and reasonableness of pipeline rates," *id.* The Commission also rejected petitioner's request for functionalized data regarding the amount of fuel waived, discounted, or reduced as part of a negotiated rate agreement, deeming the request "unnecessary and burdensome." *Id.* Commissioner Wellinghoff dissented from the Order. *See id.* at 62,708–09 (Wellinghoff, Comm'r, dissenting).

## III

"We review FERC's orders under the arbitrary and capricious standard and uphold FERC's factual findings if supported by substantial evidence." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365 (D.C. Cir. 2003); *see* 15 U.S.C. § 717r(b). In general, "judicial scrutiny under the [NGA] is limited to assuring that the Commission's decisionmaking is

reasoned, principled, and based upon the record." *Penn. Office of Consumer Advocate v. FERC*, 131 F.3d 182, 185 (D.C. Cir. 1997) (internal quotation marks omitted). "A passing reference to relevant factors, however, is not sufficient to satisfy the Commission's obligation to carry out 'reasoned' and 'principled' decisionmaking." *Mo. Pub. Serv. Comm'n v. FERC*, 234 F.3d 36, 41 (D.C. Cir. 2000). The Commission must "fully articulate the basis for its decision." *Id.* (internal quotation marks omitted).

We recognize the Commission enjoys broad discretion to invoke its expertise in balancing competing interests and drawing administrative lines. *See ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1085 (D.C. Cir. 2002) (stating FERC "has wide discretion to determine where to draw administrative lines," and thus courts "are generally unwilling to review line-drawing performed by the Commission unless a petitioner can demonstrate that lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem" (internal quotation marks omitted)); *Pub. Serv. Comm'n of the State of NY v. FPC*, 543 F.2d 757, 806 (D.C. Cir. 1974) (noting that "a vital function delegated to the Commission by the [NGA] is the maintenance of the balance between producer, pipeline, and consumer interests at the point of just and reasonable rates"). The Commission's discretion is, however, bounded by the requirements of reasoned decisionmaking. *See, e.g.*, *Interstate Natural Gas Ass'n of Am. v. FERC*, 494 F.3d 1092, 1096 (D.C. Cir. 2007). In cases where parties raise reasonable alternatives to the Commission's position, we have held that reasoned decisionmaking requires considering those alternatives. *See Laclede Gas Co. v. FERC*, 873 F.2d 1494, 1498 (D.C. Cir. 1989) ("[W]here a party raises facially reasonable alternatives to FERC's decision . . . the agency must *either* consider those alternatives *or* give some reason, within its broad discretion

. . . for declining to do so." (internal citation omitted)). We have applied this requirement to include dissenting commissioners. *See Chamber of Commerce v. SEC*, 412 F.3d 133, 137–38 (D.C. Cir. 2005). In *Chamber of Commerce*, two dissenting commissioners of the Securities and Exchange Commission (SEC) articulated a well-defined, serious option that the majority ignored. We held the SEC's failure to consider the rulemaking alternative violated the Administrative Procedure Act. *Id.* at 144. Although the SEC would be excused for failing to consider an alternative that was, "for whatever reason, unworthy of consideration," the alternative proposed by the dissenting commissioners was "neither frivolous nor out of bounds." *Id.* at 145. The SEC, therefore, "had an obligation to consider it." *Id.* (citing *Laclede Gas*, 873 F.3d at 1498). While the SEC might ultimately have decided the alternative did not sufficiently serve the interests of the parties involved, we held the commission nonetheless had a duty to "bring[] its expertise and its best judgment to bear upon that issue." *Id.*

Accordingly, while FERC is not required to agree with arguments raised by a dissenting Commissioner, *see id.*, it must, at a minimum, acknowledge and consider them. The Commission failed to do so here. Like the concerns raised in *Chamber of Commerce*, the points raised by Commissioner Wellinghoff were "neither frivolous nor out of bounds," yet the Commission provided no direct response.

With respect to the request to break out by function the new information provided on pages 521 a/b, the Commission noted some fuel information is broken out by function on page 520 of Form 2. *See* Order 710-A, 123 FERC at 62,704. Commissioner Wellinghoff, however, argued that is not enough: "[U]nless Sheets 521 a/b are broken out by function, a shipper cannot match the revenues generated by the sale of

excess fuel with the functionalized costs." *Id.* at 62,709 (Wellinghoff, Comm'r, dissenting). Thus, without the additional functionalized data, customers cannot determine whether pipelines are over-recovering their fuel costs for particular functions and whether their rates are just and reasonable. *Id.* (Wellinghoff, Comm'r, dissenting). As the Commission acknowledged in Order 710, the purpose of the rulemaking here was to "provide pipeline customers and the public the information they need to assess the justness and reasonableness of pipeline rates." Order 710, 73 Fed. Reg. at 19,389. The dissent argued such an assessment is impossible without accommodating petitioner's requests, *see* Order 710-A, 123 FERC at 62,709 (Wellinghoff, Comm'r, dissenting), yet the Commission's only response was that it had balanced the burdens and benefits of petitioner's request. *See* Order 710, 73 Fed. Reg. at 19,392; Order 710-A, 123 FERC at 62,704. The Commission apparently concluded the objections of some pipelines to the burdens of additional reporting were enough to justify rejecting petitioner's requests without further explanation. Nowhere in the Orders did the Commission claim either that customers do not need to be able to match excess fuel revenues with functionalized costs or that customers already have enough information to do so. Indeed, counsel for the Commission at oral argument acknowledged the Commission "d[id] not address that particular point." Oral Arg. Recording at 18:12–15.

With respect to the request to break out by function the amount of fuel waived, discounted, or reduced as part of a negotiated rate, Commissioner Wellinghoff argued "it is important to know the level of services provided under each rate structure in order to protect against cross-subsidization." Order 710-A, 123 FERC at 62,709 (Wellinghoff, Comm'r, dissenting). "[F]uel costs and revenues of the different types of rate structures broken down by function," he argued, "are

critical to assessing the justness and reasonableness of the pipeline's fuel rates." *Id.* (Wellinghoff, Comm'r, dissenting). Thus, the dissent was concerned not only that pipelines are over-recovering their excess fuel costs, but also that pipelines are disadvantaging existing customers by forcing them to subsidize negotiated and discounted rates provided to other customers. While the Commission proffered several justifications for its decision to reject petitioner's request for the additional discounted and negotiated rate data, the Commission never mentioned cross-subsidization. The Commission might reasonably have concluded existing data reported on Form 2 adequately protect customers against cross-subsidization, but the Commission failed even to make that claim, instead choosing to ignore the dissent's concern entirely.

Finally, addressing the potential burden imposed on pipelines by petitioner's requests, Commissioner Wellinghoff argued: "The pipeline maintains this information by function in order to change its fuel rate either in a tracking mechanism or its next section 4 rating filing, and to assure that its existing customers are not subsidizing the negotiated rate program. The increased burden is related solely to inputting the data in the Form 2." *Id.* (Wellinghoff, Comm'r, dissenting) (footnote omitted). The Commission's only statement regarding the availability of the functionalized data was that "[i]t is unlikely that all pipelines would have this information readily available since many pipelines do not periodically file to adjust fuel rates and may not keep records of this type of information." *Id.* at 62,704. The Commission said nothing about how it reached that conclusion. The Commission thus failed to acknowledge, much less substantively address, the dissent's point that pipelines do maintain the data requested. Indeed, counsel for the Commission once again admitted the majority "d[id] not respond specifically" to the point. Oral

Arg. Recording at 20:00–05. According to its counsel, the Commission was not obligated to respond since doing so was not necessary to accomplish the purpose of the rulemaking, which, counsel claimed, was to ensure pipelines were not over-recovering for excess fuel costs. Our holdings in *Chamber of Commerce* and *Laclede Gas* suggest otherwise: Where a dissenting Commissioner raises a reasonable alternative, the majority is obligated to consider it. *See Chamber of Commerce*, 412 F.3d at 145; *Laclede Gas*, 873 F.2d at 1498.

Moreover, the Commission acknowledged in Order 710 that "it is important for the Commission and the pipeline customer to know the level of services provided under each rate schedule in order to protect against cross-subsidization and to ensure that recourse rates remain just and reasonable." Order 710, 73 Fed. Reg. at 19,393–94. The Commission thus recognized providing customers with additional information to undergird section 5 complaints was necessary to protect customers not only from fuel cost over-recovery, but also from cross-subsidization. The dissent raised several concerns related to cross-subsidization, yet the Commission responded to none of them.

For the foregoing reasons, we grant the petition for review and remand to the Commission for further proceedings. On remand, the Commission may again conclude the burdens of the additional reporting requirements requested by petitioner outweigh their benefits, but the Commission must do so in a reasoned decision that acknowledges the concerns raised by the dissenting Commissioner.

*It is so ordered.*