# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 4, 2013          Decided May 28, 2013

No. 12-1339

MORPHO DETECTION, INC.,
PETITIONER

v.

TRANSPORTATION SECURITY ADMINISTRATION,
RESPONDENT

On Petition for Review of an Order of
the Transportation Security Administration

*Matthew S. Hellman* argued the cause for the petitioner.

*Jonathan R. Prouty*, Senior Trial Counsel, United States Department of Justice, argued the cause for the respondent. *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kirk T. Manhardt*, Assistant Director, were on brief.

Before: HENDERSON, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Morpho Detection, Inc. (Morpho), a California-based corporation that designs and builds explosive and other threat detection technology, contracted with the Federal Aviation Administration

(FAA), on behalf of its then-newly established Transportation Safety Administration (TSA), to supply its Explosive Detection System (EDS) to United States airports.[1] After Morpho installed EDSs at two airports in the state of Washington, the Washington Department of Revenue (Revenue Department) assessed Morpho $5,278,217 in state use and business taxes based on their installation. Morpho sought an increase of the contract price to compensate for the state assessments as "after-imposed tax[es]" pursuant to Clause 3.4.2-7(c) of the Acquisition Management System (AMS).[2] TSA rejected Morpho's claim on the ground Washington's taxes are not compensable after-imposed taxes under AMS Clause 3.4.2-7(c). We agree with TSA that the taxes are not after-imposed taxes within the meaning of the AMS and, accordingly, we deny Morpho's petition for review.

## I.

On November 23, 2001, in response to a congressional mandate to equip U.S. airports with "sufficient explosive detection systems to screen all checked baggage no later than

---

[1]The contracting entity was InVision Technologies, Inc., of which Morpho is the successor (after multiple corporate realignments and name changes). For ease of identification, we refer to the contracting party throughout as Morpho.

[2]"The FAA's [AMS] was developed in response to Congress' directive 'notwithstanding the provisions of Federal acquisition law,' to provide for more timely and cost-effective acquisitions of equipment and materials. The Office of Dispute Resolution for Acquisition is a review body that was created pursuant to this mandate, and it handles protests and contract disputes that arise under the [AMS]." *Multimax, Inc. v. FAA*, 231 F.3d 882, 884 n.1 (D.C. Cir. 2000) (quoting 49 U.S.C. § 40110(d) (2006)).

December 31, 2002,"[3] the FAA issued a "solicitation" for a fixed-price contract to provide EDSs to U.S. airports. The solicitation did not specify particular airports for EDS installation but "covered all 50 states, as well as Puerto Rico and Guam." Decl. of John ("Jack") Handrahan at 2, ¶ 8 (filed Dec. 16, 2011) (dated Oct. 14, 2011) (JA 569). In February 2002, Morpho and TSA entered into an "undefinitized letter contract under the provisions of the [FAA AMS]," which "constitute[d] an authorization for [Morpho] to commence work on . . . stand-alone explosives detection systems." Letter from TSA Contracting Officer to Morpho at 1 (dated Feb. 15, 2002) (JA 187). The letter contract stated that the FAA had "a mandate to acquire and install airport security equipment throughout the country" and that the order would include 450 units. *Id*. at 2, 3 (JA 188, 189). The parties "definitiz[ed] the letter contract" on September 6, 2003, as "fully integrated" Contract No. DTFA01-02-C-00023 (Contract 00023). Amendment of Solicitation/ Modification of Contract No. 2 (Sept. 6, 2003) (JA 201). Meanwhile, on August 5, 2003, the parties had entered a second contract—Contract No. DTSA20-03-C-01900 (Contract 01900) —for a different model EDS.

Each of the EDS contracts provided for on-site installation by Morpho: "The Contractor shall install and integrate EDS when directed by the C[ontracting ]O[fficer] by individual

---

[3]The Congress directed: "The Under Secretary of Transportation for Security shall take all necessary action to ensure that . . . explosive detection systems are deployed as soon as possible to ensure that all United States airports [regularly serving a DOT certificated carrier] have sufficient explosive detection systems to screen all checked baggage no later than December 31, 2002, and that as soon as such systems are in place at an airport, all checked baggage at the airport is screened by those systems . . . ."). Aviation and Transportation Security Act, Pub. L. No. 107-71 § 110(b), 115 Stat. 597, 615 (Nov. 19, 2001) (codified at 49 U.S.C. § 44901(d)(1)(A)).

delivery orders." Contract No. 00023 § 3.92 (JA 231); Contract No. 00019 § 3.92 (JA 383); *see also* Contract 00023 Amendment of Solicitation/Modification of Contract No.4, at 2 (Apr. 27, 2004) (amending contract to require specifically that Morpho provide "rigging and installation services" as fixed-price line item) (JA 300). Although the parties seem to have treated "task orders" (orders requesting specifically described services) and "delivery orders" (orders requesting delivery of fixed-price line items) interchangeably, the contracts included a slightly different procedure for each. In the case of the former, the TSA Contracting Officer submitted a "Draft" task order to Morpho, which then prepared a cost estimate and forwarded it to the Contracting Officer, while the latter was prepared by TSA based on the contractual line item price. Contract No. 00023 §§ H.2 (JA 265-66), H.3 (JA 266-67); Contract No. 01900 §§ H.2 (JA 417-18), H.3 (JA 418-19). In both cases, the TSA Contracting Officer reviewed the order for "acceptability, accuracy and completeness" and transmitted it to Morpho for review and signature. If Morpho found the contract as written "unacceptable," it was directed to "immediately notify the Contracting Officer and detail the reasons for its position." *Id.* §§ H.2(c), H.3(c). Pursuant to these provisions, for example, in July 2003, after receiving a draft task order to install EDS units at the Seattle Airport, Morpho sent TSA a proposal providing "an estimate for the placement of two each [EDS units] at Seattle Airport" and requesting "a written notice to proceed under a task order issued under the current contract." Letter from Morpho to TSA Contracting Officer at 1, 2 (dated July 16, 2003) (JA 511) (July 2003 Proposal); *see also* Letter from Contracting Officer to Morpho (dated July 6, 2004) (JA 513) (accepting Morpho's proposal "to provide rigging for the new installation of two [EDS units] at Spokane International Airport [], with no impact to cost, schedule, or performance under Delivery Order 3"). The July 2003 Proposal specifically noted: "Washington State gross sales tax of 8.8% has not been included

in the above pricing if it is applicable." July 2003 Proposal at 2 (JA 512). No other tax was mentioned in the proposal—nor are state taxes referenced elsewhere in documents relating to individual task/delivery orders so far as the appellate record and briefing reveal.

On April 22, 2008, the Revenue Department assessed Morpho combined use and Business and Occupation (B&O) taxes of $5,423,645 based on a partial tax audit for the period January 1, 2002 to March 31, 2006, during which period Morpho had installed EDSs under Contracts 00023 and 01900 at two Washington State airports—Seattle-Tacoma and Spokane—under fifteen task/delivery orders. After Morpho appealed the taxes administratively, the Revenue Department issued a "Final Executive Level Determination" requiring Morpho to pay use and B&O taxes of $5,278,217—an amount, Morpho claims, that "substantially exceeded the *gross revenue* that Morpho received for its services at the Washington airports." Pet'r Br. 22 (emphasis in original). The Revenue Department determined Morpho was subject to the taxes because of its status as a statutory "consumer"—a prerequisite to liability for both the use tax and the B&O tax.[4]

---

[4]The use tax

(1) . . . is hereby levied and there shall be collected from every person in th[e] state . . . for the privilege of using within th[e] state as a consumer: (a) Any article of tangible personal property purchased at retail . . . or produced or manufactured by the person so using the same, or otherwise furnished to a person engaged in any business taxable under RCW 82.04.280 (2) or (7) . . . .

Wash. Rev. Code § 82.12.020 (2001 through 2006). The B&O tax is imposed on, inter alios, "every person . . . engaging in activities which bring a person within the definition of consumer contained in RCW 82.04.190(6)." Wash. Rev. Code § 82.04.280 (2001 through 2006).

On December 24, 2008, Morpho filed a "Request for Interpretation of Contract Terms and Equitable Adjustment"—in procurement argot, a "contract dispute"—with the Office of Dispute Resolution for Acquisition (ODRA), which adjudicates disputes under the FAA's AMS. *See* Findings and Recommendations, Contract Dispute of Morpho Detection, Inc., Docket No. 08-TSA-039 (June 8, 2012) (ODRA Decision) (JA 30).[5] In its filing, Morpho requested an equitable adjustment increasing the contract price of both contracts to compensate for the Washington taxes, which it claimed were "after-imposed tax[es]" justifying a price increase under AMS Clause 3.4.2-7(c). On June 8, 2012, ODRA issued its decision, recommending that Morpho's contract dispute be denied. In an order issued July 9, 2012, the TSA Administrator "adopt[ed] the ODRA's findings and den[ied Morpho's] contract dispute in its entirety." *Morpho Detection, Inc.*, Docket No. 08-TSA-039 at 1 (July 9, 2012). Morpho timely petitioned for review of TSA's decision.

---

[5]The ODRA decision was prepared by a dispute resolution officer and approved by his director. Established in 2001 as an agency within the Department of Transportation, TSA was instructed to use AMS for "acquisitions of equipment, supplies, and materials by the Transportation Security Administration." Aviation and Transportation Security Act, § 101(a), 115 Stat. at 601 (codified at 49 U.S.C. § 114(o) (2001)). Although the Congress transferred the TSA to the Department of Homeland Security in 2002, TSA continued to use FAA's AMS until June 23, 2008. *See* Homeland Security Act, Pub. L. No. 107-296, § 424, 116 Stat. 2135, 2185 (2002); Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, sec. 6, div. E, tit. V, § 568, 121 Stat. 1844, 2092 (2007) (repealing 49 U.S.C. § 114(o)); *see also Coal. of Airline Pilots Ass'ns v. FAA*, 370 F.3d 1184, 1186 (D.C. Cir. 2004). The dispute before us relates to contracts entered into before June 23, 2008.

## II.

We have jurisdiction over Morpho's petition for review under 49 U.S.C. § 46110.[6] AMS Clause 3.4.2-7, titled "Federal, State, and Local Taxes—Fixed-Price, Noncompetitive Contract," provides generally: "Unless otherwise provided in this contract, the contract price includes all applicable Federal, State, and local taxes and duties." ODRA Decision at 3 (quoting AMS cl. 3.4.2-7(b)). It sets out an exception, however, for an "after-imposed tax," which may be recovered from the FAA notwithstanding the absence from the contract of an express provision therefor: "The contract price shall be increased by the amount of any *after-imposed tax* . . . ." *Id.* (quoting AMS cl. 3.4.2-7(c) (emphasis added)). Morpho claims the Washington taxes are "after-imposed" taxes requiring a commensurate increase in the contract price of the two contracts under the exception. TSA responds that the Washington taxes are not "after-imposed" within the meaning of AMS Clause 3.4.2-7(c) because the authorizing statutes went unchanged during the contract terms and, in any event, the contracts do not incorporate

---

[6]This section provides in relevant part:

[A] person disclosing a substantial interest in an order issued by the Secretary of Transportation . . . may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit . . . . The petition must be filed not later than 60 days after the order is issued.

49 U.S.C. § 46110 (a); *see Roberts v. Napolitano*, 463 Fed. App'x 4, 4 (D.C. Cir. 2012) ("Pursuant to 49 U.S.C. § 46110, exclusive jurisdiction to review 'an order' issued by TSA is vested in the courts of appeals." (citing 49 U.S.C. § 46110(a), (c))).

AMS Clause 3.4.2-7 or its exception.[7] We agree with TSA that *if* the exception is incorporated in the contracts—an issue we do not decide—Morpho has no recourse thereunder because the Washington taxes are not "after-imposed" taxes.[8]

An "after-imposed tax" is defined as

any new or increased Federal, State, or local tax or duty, or tax that was excluded on the contract date but whose exclusion was later revoked or amount of exemption reduced during the contract period, other than an excepted tax, on the transactions or property covered by this contract that the Contractor is required to pay or bear *as the result of legislative, judicial, or administrative action taking effect after the contract date*.

ODRA Decision at 3 (quoting AMS cl. 3.4.2-7(a)(3) (emphasis added)). Morpho acknowledged before ODRA that the

---

[7]ODRA similarly declined to decide the incorporation issue but noted that neither the November 23, 2001 solicitation nor any of the contract documents expressly incorporates AMS Clause 3.4.2-7. *See* ODRA Decision 22, 5 (¶¶ 3, 6), 10 (¶ 22). By contrast, both contracts expressly incorporate numerous other AMS contract provisions. *See* Contract 0023 at I-1 to -2 (JA 277-78); Contract 01900 at I-1 to -2 (JA 430-31).

[8]The parties disagree on the applicable standard of review. TSA asserts that its decision is "subject to the familiar determination of whether [its] decision is 'arbitrary or capricious or contrary to law.' " Resp't Br. 13 (quoting *Multimax, Inc. v. FAA*, 231 F.3d 882, 886 (D.C. Cir. 2000) (quoting 5 U.S.C. § 706(2)(A); citing *J.A. Jones Mgmt. Servs. v. FAA*, 225 F.3d 761, 764 (D.C. Cir. 2000)). Morpho contends, to the contrary, that our review is de novo. Pet'r Br. 17-20. We need not resolve the dispute because, even under the more exacting de novo review, we conclude the subject state taxes are not "after-imposed" within the meaning of AMS Clause 3.4.2-7(c).

Washington use and B&O taxes in question " 'have existed for some time' "—indeed "since 1975." ODRA Decision at 24 (quoting Morpho Final Submission Brief 12 (filed Dec. 16, 2011) (Morpho ODRA Brief)) (quotation marks omitted); *see also* Pet'r Br. 25 n.8 ("To be sure, Washington's tax was enacted by the Washington legislature long before Morpho ever submitted its tax proposal."); *see generally Washington v. United States*, 460 U.S. 536, 538-40 & n.3 (1983) (describing circumstances of 1975 enactment expanding statutory definition of "consumer" to make certain taxes applicable to federal contractors).[9] Morpho nonetheless argued that Washington had "never assessed these taxes against contractors in a similar posture" and that Washington's "novel interpretation and application of law constitutes an imposition of a new State tax that [Morpho] is required to pay or bear as a result of legislative, judicial, or administrative action taking effect after the contract date." ODRA Decision at 24 (quoting Morpho ODRA Brief 12) (quotation marks omitted) (JA 53); *see also* Pet'r Br. 33-38. For taxing purposes, Washington defines "consumer" to include

> (6) *Any person engaged in the business of constructing, repairing, decorating, or improving new or existing buildings or other structures under, upon, or above real property of or for the United States, any instrumentality thereof,* or a county or city housing authority created pursuant to chapter 35.82 RCW,

---

[9]The history of Washington's statutory definition of "consumer" is tortuous. *See Washington v. United States*, 460 U.S. at 538-40. The United States Supreme Court made clear, however, that the definition was amended in 1975 to remediate the problem caused by the fact that Washington's "tax system could not . . . be applied to construction for the Federal Government because the Supremacy Clause prohibits States from taxing the United States directly" with the "result . . . that for federal projects the legal incidence of the tax falls on the contractor rather than the landowner." *Id*.

*including the installing or attaching of any article of tangible personal property therein or thereto, whether or not such personal property becomes a part of the realty by virtue of installation . . . .*

Wash. Rev. Code § 82.04.190 (2001 through 2006) (emphases added). Morpho maintains that, "at a minimum, the text, history, and purpose of the Washington tax statute demonstrate that it is ambiguous and that it does not plainly support the imposition of the tax here." Pet'r Br. 34. The statutory definition does indeed seem ambiguous in that the meaning of "real property of or for the United States" is unclear. The statute may mean, as Morpho contends, that the "real property" must be, conjunctively, both "of" and "for" the United States—which the two airport properties are not because each is "of" (i.e., belongs to) local authorities, not the United States. Alternatively, the phrase may be read to mean the person must be "engaged in the business of constructing, repairing, decorating, or improving new or existing buildings or other structures," disjunctively, either "under, upon, or above real property of . . . the United States" or "for the United States," *see* Revenue Department Determination at 6 n.6 (JA 554)—the meaning that the Revenue Department used to tax Morpho as a consumer and that TSA adopts. *See Unification Church v. INS*, 762 F.2d 1077, 1084 (D.C. Cir. 1985) ("We start with the proposition that the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity. That trouble with the word has been with us for a long time." (quoting *De Sylva v. Ballentine*, 351 U.S. 570, 573 (1956))); *see also United States v. Fisk*, 70 U.S. (3 Wall.) 445, 447 (1865) ("[C]ourts are often compelled to construe '*or*' as meaning '*and*,' and again '*and*' as meaning '*or*.' "). The ambiguity, however, avails Morpho nought.

To be "after-imposed," a tax must be (1) either a "new or increased" tax or one that was "excluded on the contract date but whose exclusion was later revoked or amount of exemption reduced during the contract period" and (2) one "that the Contractor is required to pay or bear as the result of legislative, judicial, or administrative action taking effect after the contract date." ODRA Decision at 3 (quoting AMS cl. 3.4.2-7(a)(3)). The Washington use and B&O taxes fail the first prong of the test because they were neither "new" nor "increased" nor subject to an "exclusion . . . revo[cation]" or "exemption reduc[tion]": they were in existence and fixed at the same rates throughout the terms of Contract 00023 and Contract 01900—and the key statutory definition of "consumer" likewise remained the same throughout. *See* Wash. Rev. Code §§ 82.12.020, 82.04.280 (2001 through 2006), *supra* note 4 (taxing provisions); Wash. Rev. Code § 82.04.190 (2001 through 2006) ("consumer" definition). The taxes fail the second prong as well as there was no "legislative, judicial, or administrative action taking effect after the contract date" "as the result of" which Morpho was "required to pay or bear" the taxes assessed.

Morpho contends the Revenue Department proceeding that resulted in the final assessment constitutes a qualifying "administrative action." As an initial matter, we decline to read "administrative action" so broadly as to include every administrative assessment as a matter of course; so read, AMS Clause 3.4.2-7(c)'s after-imposed-tax exception would swallow the tax-inclusive presumption of its rule—that "[u]nless otherwise provided in th[e] contract, the contract price includes all applicable Federal, State, and local taxes and duties"— because virtually every tax involves an administrative assessment. We will not adopt a reading that would so render the FAA's general rule a nullity. Instead we accept the natural reading of the language, namely, that it is directed to a governmental action—which may include an administrative assessment—that effects a *substantive change* in the statutory

taxing provisions or the interpretation thereof. *See, e.g.*, *Morrison-Knudsen Co. v. United States*, 427 F.2d 1181 (Ct. Cl. 1970) (statutory increase in social security taxes constituted "after-imposed" tax under parallel Federal Acquisition Regulation). The assessment here effected no such change.

While Morpho asserts the use and B&O taxes "had never been assessed against a contractor doing work on non-federal property," Pet'r Br. 37, it does not claim the Revenue Department's assessment here reflects a reversal of the state's previous interpretation or application of the statutes at issue. *Cf. Cannon Structures, Inc.*, IBCA 3968-98, 99-1 BCA ¶ 30,236, 1999 WL 85531 (Interior Bd. of Contract Appeals Feb. 10, 1999) (concluding Arizona state tax assessed on pipeline construction on Indian reservation was "newly imposed and collected" based on "Arizona's decision not to tax construction projects on Indian reservations at the time Appellant entered into its contract with the Government" and the subsequent "decision by Arizona to resume collecting [state tax] in connection with projects on Indian reservations") (dictum). To the contrary, Morpho's counsel asserted to ODRA that " '[n]o Washington court ha[d] addressed' the questions he raised regarding the definition of 'consumer,' making them 'issues of first impressions.' " ODRA Decision at 27 n.18 (quoting declaration of lawyer who represented Morpho in administrative proceeding); *see also id.* at 26 ("[Morpho] does not cite to prior, contrary interpretations of the statute, whether in case law, official tax guides, or even the press."). Moreover, ODRA undertook its own investigation which "independently ha[d] not found any contrary legal interpretation, despite the long history of applying the use tax to federal contractors within the State of Washington," *id.* at 26—a determination Morpho has not gainsaid. Nor is this a case where the "administrative action" adopted an interpretation inconsistent with the express statutory language, which, as we have explained and Morpho has acknowledged, is ambiguous. *See supra* p. 10; Pet'r Br. 12

("ODRA further rejected Morpho's contention that the Washington tax statute was ambiguous . . . ."). In sum, Morpho was not "required to pay or bear [the use and B&O taxes] *as the result of . . . administrative action taking effect after the contract date*." AMS cl. 3.4.2-7(a)(3) (emphasis added).

Finally, we find unpersuasive Morpho's claim of unfair surprise—its complaint that "at the time Morpho submitted the proposal, Morpho *did not know* that the Detection Systems would be installed in Washington" and that "the tax had never been assessed against a contractor doing work on non-federal property" there. Pet'r Br. 22, 37 (emphasis in original). Morpho knew from the start the specification contract "covered all 50 states," which could include Washington (and knew for certain it did so include Washington when Morpho submitted cost estimates for the individual Washington airport task/delivery orders). Moreover, given the ambiguous language of Wash. Rev. Code § 82.04.190(6), Morpho should have known it might reasonably be determined to be a "consumer" whose business activities in Washington were subject to the use and B&O taxes.[10] Accordingly, Morpho could have expressly excluded the use and B&O taxes from the contract price in the individual Washington task/delivery orders—either in its cost estimate proposal responding to a draft task order, as it had excluded the Washington *sales* tax in its July 2003 Proposal, *supra* pp. 4-5—or in response to the Contracting Officer's transmission of the final task/delivery order. But it did not. In any event, Morpho's uncertainty does not render the use and B&O taxes "after-imposed" within the meaning of AMS Clause

---

[10]Whether the Revenue Department's statutory construction is correct as a matter of public policy or of legislative intent is a question left to the Washington state courts where Morpho is currently challenging the tax assessment "on a variety of state-law grounds." Pet'r Br. 6 n.4. We conclude only that it is a permissible interpretation of the ambiguous language.

3.4.2-7(c).   As we have explained, the Washington taxes assessed against Morpho do not satisfy the after-imposed tax exception's precisely limned terms.

For the foregoing reasons, we deny Morpho's petition for review.

*So ordered.*