Opinion for the Court by Circuit Judge BROWN.
Dissenting opinion filed by Senior Circuit Judge EDWARDS.
BROWN, Circuit Judge:
Electric Power Supply Association and four other energy industry associations (“Petitioners”) petition this court for review of a final rule by the Federal Energy Regulatory Commission (“FERC” or “the Commission”) governing what FERC calls “demand response resources in the wholesale energy market.” The rule seeks to incentivize retail customers to reduce electricity consumption when economically efficient. Petitioners complain FERC’s new rule goes too far, encroaching on the states’ exclusive jurisdiction to regulate the retail market. We agree and vacate the rule in its entirety.
*219 I
Under the Federal Power Act (“FPA” or “the Act”) the Commission is generally charged with regulating the transmission and sale of electric power in interstate commerce. The FPA “split[s] [jurisdiction over the sale and delivery of electricity] between the federal government and the states on the basis of the type of service being provided and the nature of the energy sale.” Niagara Mohawk Power Corp. v. FERC, 452 F.3d 822, 824 (D.C.Cir.2006). Section 201 of the Act empowers FERC to regulate “the sale of electric energy at wholesale in interstate commerce.” 16 U.S.C. § 824(b)(1) (emphasis added). Thus, “FERC’s jurisdiction over the sale of electricity has been specifically confined to the wholesale market.” New York v. FERC, 535 U.S. 1, 19, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002).
The Commission concedes that “demand response is a complex matter that lies at the confluence of state and federal jurisdiction.” See Demand Response Compensation in Organized Wholesale Energy Markets, 134 FERC ¶ 61,187, 2011-WL 890975, at *30 (Mar. 15, 2011) [hereinafter Order 74£\. For more than a decade, FERC has permitted demand-side resources to participate in organized wholesale markets, allowing Independent System Operators (ISOs) and Regional Transmission Organizations (RTOs) to use demand-side resources to meet their systems’ needs for wholesale energy, capacity, and ancillary services. As this court has noted, Congress in 2005 declared “the policy of the United States that time-based pricing and other forms of demand response ... shall be encouraged ... and unnecessary barriers to demand response participation in energy, capacity and ancillary service markets shall be eliminated.” Ind. Util. Reg. Comm’n v. FERC, 668 F.3d 735, 736 (D.C.Cir.2012) (citing 16 U.S.C. § 2642). The Commission has issued dozens of orders on demand-side resource participation, and ISOs and RTOs maintaining economic demand response programs could file tariffs with the Commission and accept bids for ancillary services and from aggregators of retail customers directly into the wholesale energy markets. See Wholesale Competition in Regions with Organized Electric Markets, 73 Fed.Reg. ¶ 64,100, 64,101 (Oct. 28, 2008) (to be codified at 18 C.F.R. pt. 35) [Order 719],
Order 7^5 establishes uniform compensation levels for suppliers of demand response resources who participate in the “day-ahead and real-time energy markets.” Order 7^5, 2011 WL 890975, at *1. The order directs ISOs and RTOs to pay those suppliers, including aggregators of retail customers, the full locational marginal price (LMP), or the marginal value of resources in each market typically used to compensate generators. The Commission conditioned the payment of full LMP on the ability of a demand response resource to replace a generation resource and required demand response to be cost effective. Cost effectiveness would be determined by a newly devised “net benefits test,” which FERC directed ISOs and RTOs to implement. FERC acknowledged that the cost of payments to retail customers to encourage reduced energy consumption would have to be subsidized by load-serving entities participating in the wholesale market. Id. ¶ 99, 2011 WL 890975, at *27; see also id. ¶ 102. Finally, the rule allocated the costs of demand response payments proportionally to all entities that purchase from the relevant energy markets during times when demand response resources enter the market. Commissioner Moeller dissented, arguing the Commission’s retail customer compensation scheme conflicted both with FERC’s efforts to promote competitive *220 markets and with its statutory mandate to ensure supplies of electric energy at just, reasonable, and not unduly preferential or discriminatory rates. See id., 2011 WL 890975, at *34-39.
Requests for rehearing and clarification were filed by ISOs, RTOs, state regulatory commissions, trade associations, publicly owned utilities, transmission owners, suppliers, and others. The Commission, in another 2-1 decision, confirmed its approach and Petitioners filed timely petitions for review.
II
The Administrative Procedure Act (APA) directs us to “hold unlawful and set aside agency action ... in excess of statutory jurisdiction, authority, or limitations.” 5 U.S.C. § 706(2)(C). “FERC is a creature of statute” and thus “has no power to act unless and until Congress confers power upon it.” Cal. Indep. Sys. Operator Corp. (CAISO) v. FERC, 372 F.3d 395, 398 (D.C.Cir.2004) (citing La. Pub. Serv. Comm’n v. FCC, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986)). If FERC lacks authority under the Federal Power Act to promulgate a rule, its action is “plainly contrary to law and cannot stand.” See Michigan v. EPA, 268 F.3d 1075, 1081 (D.C.Cir.2001).
We address FERC’s assertion of its statutory authority under the familiar Chevron doctrine. See City of Arlington, Tex. v. FCC, — U.S.-, 133 S.Ct. 1863, 1870-71, — L.Ed.2d - (2013). The question is “whether the statutory text forecloses the agency’s assertion of authority.” Id. at 1871. If, however, the statute is silent or ambiguous on the specific issue, we must defer to the agency’s reasonable construction of the statute. Id. at 1868.
FERC claims when retail consumers voluntarily participate in the wholesale market, they fall within the Commission’s exclusive jurisdiction to make rules for that market. Petitioners protest that retail sales of electricity are within the traditional and “exclusive jurisdiction of the States” and regulating consumption by retail electricity customers is a regulation of retail, not wholesale, activity. Reply Br. 11-12. The problem, Petitioners say, is the Commission has no authority to draw retail customers into the wholesale markets by paying them not to make retail purchases.
Initially, we note the regulations have a single definition of “demand response” — a “reduction in the consumption of electric energy by customers from their expected consumption in response to an increase in the price of electric energy or to incentive payments designed to induce lower consumption of electric energy.” 18 C.F.R. § 35.28(b)(4) (emphasis added); see also Order U5, 2011 WL 890975, at *1 n. 2. High retail rates will reduce demand. Conversely, if consumers are paid to reduce demand, prices fall. FERC acknowledges the first case, “price-responsive demand” is a “retail-level” demand response. See Order U5, 2011 WL 890975, at *1-3 & n. 2 (citing 18 C.F.R. § 35.28(b)(4)). In contrast, FERC dubs a reduction in the consumption of energy in response to incentive payments a “wholesale demand response.” See FERC Br. 5, 34; see also Order 715, 2011 WL 890975, at *1-3 & n. 2 (citing 18 C.F.R. § 35.28(b)(4)). The Commission draws this distinction between “wholesale demand response” and “retail demand response” in an attempt to narrow the logical reach of its rule. See, e.g., FERC Br. 5 (“[T]he Commission has made plain that its focus is narrow and that it addresses only wholesale demand response.”); id. (“States remain free to authorize and oversee retail demand response programs.”); id. at 14-15. Yet *221 FERC acknowledges “wholesale demand response” is a fiction of its own construction. See Oral Arg. Tape, No. 11-1486, at 27:31 (Sept. 23, 2013) (conceding “selling” demand response resources in the wholesale market “is a bit of a fiction”). Demand response resources do not actually sell into the market. Demand response does not involve a sale, and the resources “participate” only by declining to act.
As noted, and as the Commission concedes, demand response is not a wholesale sale of electricity; in fact, it is not a sale at all. See Order 745, 2011 WL 890975, at *18 (“[T]he Commission does not view demand response as a resale of energy back into the energy market.”). Thus, FERC astutely does not rely exclusively on its wholesale jurisdiction under § 201(b)(1) for authority. See Niagara Mohawk Power Corp., 452 F.3d at 828 & n. 7.
Instead, FERC argues §§ 205 and 206 grant the agency authority over demand response resources in the wholesale market. These provisions task FERC with ensuring “all rules and regulations affecting ... rates” in connection with the wholesale sale of electric energy are “just and reasonable.” 16 U.S.C. § 824d(a) (emphasis added); see also id. § 824e(a). Thus, the Commission argues it has jurisdiction over demand response because it “directly affects wholesale rates.” FERC Br. 32-34; see also Order 745, 2011 WL 890975, at *30.
We agree with the Commission that demand response compensation affects the wholesale market. Because of the direct link between wholesale and retail markets, compare FERC Br. 32, with Pet’rs Br. 11-14 (describing the “direct” relationship between wholesale and retail rates), and Reply Br. 12 (“[Tjhere is undeniably a link between wholesale rates and retail sales”), a change in one market will inevitably beget a change in the other. Reducing retail consumption — through demand response payments — will lower the wholesale price. See Oral Arg. Tape, at 33:13. Demand response will also increase system reliability. FERC Br. 33. Because incentive-driven demand response affects the wholesale market in these ways, the Commission argues §§ 205 and 206 are clear grants of agency power to promulgate Order 7k5.
The Commission’s rationale, however, has no limiting principle. Without boundaries, §§ 205 and 206 could ostensibly authorize FERC to regulate any number of areas, including the steel, fuel, and labor markets. FERC proposes the “affecting” jurisdiction can be appropriately limited to “direct participants” in jurisdictional wholesale energy markets. See FERC Br. 37. But, as this case demonstrates, the directness of participation may be a function of the richness of the incentives FERC commands. The commission’s authority must be cabined by something sturdier than creative characterizations. See Altamont Gas Transmission Co. v. FERC, 92 F.3d 1239, 1248 (D.C.Cir.1996) (noting FERC cannot “do indirectly what it could not do directly”). The “direct participant” theory also assumes FERC can “lure” non-jurisdictional resources into the wholesale market in the first place to create jurisdiction, see Oral Arg. Tape, at 29:52, which is the heart of the Petitioners’ challenge.
The limits of §§ 205 and 206 are best determined in the context of the overall statutory scheme. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Congressional intent is clearly articulated in § 201’s text: FERC’s reach “extend[s] only to those matters which are not subject to regulation by the States.” 16 U.S.C. § 824(a). States retain exclusive authority to regulate the retail mar *222 ket. See Niagara Mohawk Power Corp., 452 F.3d at 824. Absent a “clear and specific grant of jurisdiction” elsewhere, see New York, 585 U.S. at 22, 122 S.Ct. 1012, the agency cannot regulate areas left to the states. The broad “affecting” language of §§ 205 and 206 does not erase the specific limits of § 201.[1] See generally RadLAX Gateway Hotel, LLC v. Amalgamated Bank, — U.S. -, 132 S.Ct. 2065, 2071, 182 L.Ed.2d 967 (2012); sections 205 and 206 do not constitute a “clear and specific grant of jurisdiction.” Indeed, the Commission agrees its jurisdiction to regulate practices “affecting” rates does not “trump[ ] the express limitation on its authority to regulate non-wholesale sales.” FERC Br. 34-35. Otherwise, FERC could engage in direct regulation of the retail market whenever the retail market affects the wholesale market, which would render the retail market prohibition useless. Cf. Morpho Detection, Inc. v. TSA, 717 F.3d 975, 981 (D.C.Cir.2013) (declining to “adopt a reading that would render the ... general rule a nullity”).
In addition, if FERC’s arguments are followed to their logical conclusions, price-responsive demand response — retail demand response in “FERC speak” — would also affect jurisdictional rates in the same way as the type of demand response at issue in FERC’s rule here, and FERC’s authority regarding demand response would be almost limitless. Although the current rule leaves price-responsive demand untouched, nothing would stop FERC from expanding this regulation and encroaching further on state authority in the future.
Thus, FERC can regulate practices affecting the wholesale market under §§ 205 and 206, provided the Commission is not directly regulating a matter subject to state control, such as the retail market. Cf. Conn. Dep’t of Pub. Util. Control v. FERC, 569 F.3d 477, 479 (D.C.Cir.2009) (finding FERC could regulate the installed capacity market under its affecting jurisdiction because FERC did not engage in direct regulation of an area subject to exclusive state control).[2]
*223 The fact that the Commission is only “luring” the resource to enter the market instead of requiring entry does not undercut the force of Petitioners’ challenge. The lure is change of the retail rate. Demand response — simply put — is part of the retail market. It involves retail customers, their decision whether to purchase at retail, and the levels of retail electricity consumption. If FERC had directed ISOs to give a credit to any consumer who reduced its expected use of retail electricity, FERC would be directly regulating the retail rate. At oral argument, the Commission conceded crediting would be an impermissible intrusion into the retail market. See Oral Arg. Tape, at 27:15. Ordering an ISO to compensate a consumer for reducing its demand is the same in substance and effect as issuing a credit.[3] Thus, while it is true demand response can occur in two ways — through a response to either price change or incentive payments — nothing about the latter makes it “wholesale.” A buyer is a buyer, but a reduction in consumption cannot be a “wholesale sale.” FERC’s metaphysical distinction between price-responsive demand and incentive-based demand cannot solve its jurisdictional quandary.
Nor does FERC’s reliance on a statement of congressional policy from the Energy Policy Act of 2005 save its rule. FERC insists its actions “are consistent with Congressional policy requiring federal level facilitation of demand response, because this final rule is designed to remove barriers to demand response participation in the organized wholesale energy markets.” Order 74,5, 2011 WL 890975, at *30. FERC’s reliance on this language is perplexing; if anything, the policy statement supports the opposite conclusion, that Congress intended demand response resources to be regulated by states, as part of the retail market.
The Energy Policy Act of 2005 confirms the national policy of encouraging and facilitating “the deployment of [time-based pricing and other demand response] technology and devices that enable electricity customers to participate in such pricing and demand response systems ... and [eliminating] unnecessary barriers to demand response participation in energy, capacity and ancillary service markets.” Pub.L. No. 109-58, § 1252(f), 119 Stat. 594, 966 (2005). As an initial matter, even if § 1252(f) supports FERC’s authority, the Commission cannot rely on the section for an independent source of power. Policy statements like § 1252(f) “are just that — statements of policy. They are not delegations of regulatory authority.” See Comcast Corp. v. FCC, 600 F.3d 642, 654 (D.C.Cir.2010); cf. New York, 535 U.S. at 22, 122 S.Ct. 1012 (finding that a “mere policy declaration ... cannot nullify a clear and specific grant of jurisdiction”). Thus, the relevant sections of the Energy Policy Act of 2005 can only be used to “help delineate the contours of statutory authority.” Comcast Corp., 600 F.3d at 654. And here, those contours do not encompass federal regulation of demand response.
FERC latches onto the language in § 1252(f) requiring elimination of “unnecessary barriers to demand response participation in energy ... service markets” to support its claim that Order 745 advances congressional policy. See FERC Br. 40. In Order 745, however, FERC went far beyond removing barriers to demand response resources. Instead of simply “removing barriers,” the rule draws demand response resources into the market and *224 then dictates the compensation providers of such resources must receive.
We think the title of the section is noteworthy: “Federal Encouragement of Demand Response Devices.” (emphasis added). Pub.L. No. 109-58, § 1252(f), 119 Stat. 594, 966. “To encourage” is not “to regulate.” Although the title is “not dis-positive of the provision’s meaning,” “it is not too much to expect that it has something to do with the subject matter” of the section. See CAISO, 372 F.3d at 399. And here, “review of the statutory text reveals that [the title] has everything to do with the subject matter.” See id. The section dictates demand response is to be “encouraged” and “facilitated,” not directly regulated as Order 7k5 proposes.
This is obvious when § 1252(f) is read in tandem with § 1252(e), “Demand Response and Regional Coordination,” which declares it the “policy of the United States to encourage States to coordinate, on a regional basis, State energy policies to provide reliable and affordable demand response services to the public.” Pub.L. No. 109-58, § 1252(e), 119 Stat. 594, 966. This language underscores that states, not the Commission, regulate demand response. Indeed, § 1252(e) goes on to note FERC should “provide technical assistance to States and regional organizations ... in ... developing plans and programs to use demand response to respond to peak demand or emergency needs.” Id. The Commission is also to prepare an annual report, assessing demand response resources. Id. Thus, the Energy Policy Act clarifies FERC’s authority over demand response resources is limited: its role is to assist and advise state and regional programs.
Even more importantly, the Energy Policy Act statements show Congress understood the importance of demand response resources to the wholesale market — an importance Petitioners do not dispute. Yet, despite this significant impact on the wholesale market, Congress left regulation of this aspect of retail demand up to the states, rather than to the federal government.
Because the Federal Power Act unambiguously restricts FERC from regulating the retail market, we need not reach Chevron step two. But even if we assumed the statute was ambiguous — as Judge Edwards argues, we would find FERC’s construction of it to be unreasonable for the same reasons we find the statute unambiguous. Because FERC’s rule entails direct regulation of the retail market — -a matter exclusively within state control — it exceeds the Commission’s authority.
IV
Alternatively, even if we assume FERC had statutory authority to execute the Rule in the first place, Order 7k5 would still fail because it was arbitrary and capricious.
Under the APA, we must set aside orders that are “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A). In particular, “it most emphatically remains the duty of this court to ensure that an agency engage the arguments raised before it,” NorAm Gas Transmission Co. v. FERC, 148 F.3d 1158, 1165 (D.C.Cir.1998), including the arguments of the agency’s dissenting commissioners, Am. Gas Ass’n v. FERC, 593 F.3d 14, 19 (D.C.Cir.2010); see also Kamargo Corp. v. FERC, 852 F.2d 1392, 1398 (D.C.Cir.1988) (“We recognize that this case presents a difficult problem for the Commission, but we think it has no alternative but to confront the questions raised by the [commissioner’s] dissent.”).
*225 A review of the record reveals FERC failed to properly consider — and engage— Commissioner Moeller’s reasonable (and persuasive) arguments, reiterating the concerns of Petitioners and other parties, that Order 7^5 will result in unjust and discriminatory rates. Moeller argued Order 7U5 “overcompensat[es]” demand response resources because it “requires that demand resource[s] be paid the full LMP plus be allowed to retain the savings associated with [the provider’s] avoided retail generation cost.” Demand Response Compensation in Organized Wholesale Energy Markets: Order on Rehearing and Clarification, 137 FERC ¶ 61,215, 2011 WL 6523756, at *38 (Dec. 15, 2011) [hereinafter Order 7J5-A] (Moeller, dissenting); see also Pet’rs Br. 45-50. The Commission then responded that demand response resources are comparable to generation resources and should therefore receive the same level of compensation. Order 7U5-A, 2011 WL 6523756, at *14-15. Yet comparable contributions cannot be the reason for equal compensation, when generation resources are incomparably saddled with generation costs. Nor can FERC justify its current overcompensation by pointing to past under-compensation.[4] Although we need not delve now into the dispute among experts, see, e.g., Br. of Leading Economists as Amicus Curiae in Support of Pet’rs, the potential windfall to demand response resources seems troubling, and the Commissioner’s concerns are certainly valid. Indeed, “overcompensation cannot be just and reasonable,” Order 74,5-A, 2011 WL 6523756, at *38 (Moeller, dissenting), and the Commission has not adequately explained how their system results in just compensation.
The Commission cannot simply talk around the arguments raised before it; reasoned decisionmaking requires more: a “direct response,” which FERC failed to provide here. See Am. Gas Ass’n, 593 F.3d at 20. Thus, if FERC thinks its jurisdictional struggles are its only concern with Order 7J5, it is mistaken. We would still vacate the Rule if we engaged the Petitioners’ substantive arguments.
V
Ultimately, given Order 71^5’s direct regulation of the retail market, we vacate the rule in its entirety as ultra vires agency action.
For the reasons set forth above, we vacate and remand the rulings under review.

So ordered.

. The Dissent focuses extensively on § 201(b)(1), positing that the “jurisdictional issue turns on a rather straightforward question of statutory interpretation: whether a promise to forgo consumption of electricity that would have been purchased in the retail electricity market unambiguously constitutes a "sale of electric energy” under section 201(b)(1).” Dissenting Op. at 227. The jurisdictional issue is not quite so narrow. In fact, even the Commission does not characterize the challenge this way and never offers an interpretation of § 201(b)(1), arguing instead that demand response resources are direct participants in wholesale markets. See FERC Br. 34-40. Though our review is deferential, even if we reached Chevron step two, we could not defer to an interpretation the agency has not offered.
In any event, we do not base our conclusion on the "any other sales” language of § 201(b)(1). Rather, we look to the statutory scheme as a whole and find that demand response, while not necessarily a retail sale, is indeed part of the retail market, which, as the statute and case law confirm, is exclusively within the state's jurisdiction.

. Connecticut Department of Public Utility Control v. FERC, 569 F.3d 477 (D.C.Cir.2009), does not sanction FERC’s rule. In Connecticut, FERC raised the capacity requirement and incidentally incentivized construction of more generation facilities, which are subject to state control; here, the Commission’s rule reaches directly into the retail market to draw retail consumers into its scheme. Here, FERC’s incentive is not merely a logical byproduct of the rule; it is the rule. According to the Dissent, "FERC can indirectly incentivize action that it cannot directly require so long as it is otherwise acting within its jurisdiction.” Dissenting Op. at 234. We agree Connecticut cannot control where FERC has directly incentivized action it cannot directly require.

. The agency’s concession contradicts the Dissent’s contention that FERC can regulate demand response here because "non-consumption [does not] constitute an ‘other sale,’ ” Dissenting Op. at 233.

. Similarly, the hope that demand response resources will use the expected windfall for "capital improvements,” see Dissenting Op. at 237, does not respond to Petitioner's concerns that the overcompensation is unfair and discriminatory.