# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 23, 2013       Decided May 23, 2014

No. 11-1486

ELECTRIC POWER SUPPLY ASSOCIATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MADISON GAS AND ELECTRIC COMPANY, ET AL.,
INTERVENORS

Consolidated with 11-1489, 12-1088, 12-1091, 12-1093

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

*Ashley C. Parrish* argued the cause for petitioners Electric Power Supply Association, et al. With him on the briefs were *David G. Tewksbury*, *Stephanie S. Lim*, *David B. Raskin*, *Harvey L. Reiter*, and *Adrienne E. Clair*.

*Daniel J. Shonkwiler* argued the cause for petitioners California Independent System Operator Corporation, et al. With him on the briefs were *Nancy J. Saracino*, *Roger E.*

*Collanton*, *Frank R. Lindh*, *Mary F. McKenzie*, and *Charlyn A. Hook*.

*Sandra E. Rizzo* was on the brief for intervenors PJP Power Providers Group, et al. in support of petitioners.

*Jeffrey A. Lamken*, *Martin V. Totaro*, and *John L. Shepherd Jr.* were on the brief for *amici curiae* Robert L. Borlick, et al. in support of petitioners.

*Robert H. Solomon*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *David L. Morenoff*, Acting General Counsel, and *Holly E. Cafer*, Attorney.

*Donald J. Sipe*, *Jonathan G. Mermin*, *Robert A. Weishaar Jr.*, *Joseph D. Shelby*, *Barry S. Spector*, *Paul M. Flynn*, *Kriss E. Brown*, *Marvin T. Griff*, *Miles H. Mitchell*, *Ransom E. Davis*, and *Owen J. Kopon* were on the brief for intervenors Counsel of Coalition of Midwest Transmission Customers, et al. in support of respondent.

*Vickie L. Patton* and *John N. Moore* were on the brief for *amici curiae* Environmental Defense Fund, et al. in support of respondent.

Before: BROWN, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

Opinion for the Court by *Circuit Judge* BROWN.

Dissenting opinion filed by *Senior Circuit Judge* EDWARDS.

BROWN, *Circuit Judge*: Electric Power Supply Association and four other energy industry associations

("Petitioners") petition this court for review of a final rule by the Federal Energy Regulatory Commission ("FERC" or "the Commission") governing what FERC calls "demand response resources in the wholesale energy market." The rule seeks to incentivize retail customers to reduce electricity consumption when economically efficient. Petitioners complain FERC's new rule goes too far, encroaching on the states' exclusive jurisdiction to regulate the retail market. We agree and vacate the rule in its entirety.

I

Under the Federal Power Act ("FPA" or "the Act") the Commission is generally charged with regulating the transmission and sale of electric power in interstate commerce. The FPA "split[s] [jurisdiction over the sale and delivery of electricity] between the federal government and the states on the basis of the type of service being provided and the nature of the energy sale." *Niagara Mohawk Power Corp. v. FERC*, 452 F.3d 822, 824 (D.C. Cir. 2006). Section 201 of the Act empowers FERC to regulate "the sale of electric energy *at wholesale* in interstate commerce." 16 U.S.C. § 824(b)(1) (emphasis added). Thus, "FERC's jurisdiction over the sale of electricity has been specifically confined to the wholesale market." *New York v. FERC,* 535 U.S. 1, 19 (2002).

The Commission concedes that "demand response is a complex matter that lies at the confluence of state and federal jurisdiction." *See* Demand Response Compensation in Organized Wholesale Energy Markets, 134 FERC ¶ 61,187, 2011 WL 890975, at *30 (Mar. 15, 2011) [hereinafter Order 745]. For more than a decade, FERC has permitted demand-side resources to participate in organized wholesale markets, allowing Independent System Operators (ISOs) and Regional

Transmission Organizations (RTOs) to use demand-side resources to meet their systems' needs for wholesale energy, capacity, and ancillary services.  As this court has noted, Congress in 2005 declared "the policy of the United States that time-based pricing and other forms of demand response . . . shall be encouraged . . . and unnecessary barriers to demand response participation in energy, capacity and ancillary service markets shall be eliminated." *Ind. Util. Reg. Comm'n v. FERC*, 668 F.3d 735, 736 (D.C. Cir. 2012) (citing 16 U.S.C. § 2642).  The Commission has issued dozens of orders on demand-side resource participation, and ISOs and RTOs maintaining economic demand response programs could file tariffs with the Commission and accept bids for ancillary services and from aggregators of retail customers directly into the wholesale energy markets.  *See* Wholesale Competition in Regions with Organized Electric Markets, 73 Fed. Reg. ¶ 64,100, 64,101 (Oct. 28, 2008) (to be codified at 18 C.F.R. pt. 35) [Order 719].

Order 745 establishes uniform compensation levels for suppliers of demand response resources who participate in the "day-ahead and real-time energy markets."  Order 745, 2011 WL 890975, at *1.  The order directs ISOs and RTOs to pay those suppliers, including aggregators of retail customers, the full locational marginal price (LMP), or the marginal value of resources in each market typically used to compensate generators.  The Commission conditioned the payment of full LMP on the ability of a demand response resource to replace a generation resource and required demand response to be cost effective.  Cost effectiveness would be determined by a newly devised "net benefits test," which FERC directed ISOs and RTOs to implement.  FERC acknowledged that the cost of payments to retail customers to encourage reduced energy consumption would have to be subsidized by load-serving entities participating in the wholesale market.  *Id.* ¶ 99, 2011

WL 890975, at *27; *see also id.* ¶ 102. Finally, the rule allocated the costs of demand response payments proportionally to all entities that purchase from the relevant energy markets during times when demand response resources enter the market. Commissioner Moeller dissented, arguing the Commission's retail customer compensation scheme conflicted both with FERC's efforts to promote competitive markets and with its statutory mandate to ensure supplies of electric energy at just, reasonable, and not unduly preferential or discriminatory rates. *See id.*, 2011 WL 890975, at *34–39.

Requests for rehearing and clarification were filed by ISOs, RTOs, state regulatory commissions, trade associations, publicly owned utilities, transmission owners, suppliers, and others. The Commission, in another 2–1 decision, confirmed its approach and Petitioners filed timely petitions for review.

## II

The Administrative Procedure Act (APA) directs us to "hold unlawful and set aside agency action . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). "FERC is a creature of statute" and thus "has no power to act unless and until Congress confers power upon it." *Cal. Indep. Sys. Operator Corp. (CAISO) v. FERC*, 372 F.3d 395, 398 (D.C. Cir. 2004) (citing *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). If FERC lacks authority under the Federal Power Act to promulgate a rule, its action is "plainly contrary to law and cannot stand." *See Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001).

We address FERC's assertion of its statutory authority under the familiar *Chevron* doctrine. *See City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1870–71 (2013). The question

is "whether the statutory text forecloses the agency's assertion of authority." *Id.* at 1871. If, however, the statute is silent or ambiguous on the specific issue, we must defer to the agency's reasonable construction of the statute. *Id.* at 1868.

FERC claims when retail consumers voluntarily participate in the wholesale market, they fall within the Commission's exclusive jurisdiction to make rules for that market. Petitioners protest that retail sales of electricity are within the traditional and "exclusive jurisdiction of the States" and regulating consumption by retail electricity customers is a regulation of retail, not wholesale, activity. Reply Br. 11–12. The problem, Petitioners say, is the Commission has no authority to draw retail customers into the wholesale markets by paying them not to make retail purchases.

Initially, we note the regulations have a single definition of "demand response"—a "reduction in the *consumption* of electric energy by customers from their expected consumption in response to *an increase in the price of electric energy* or *to incentive payments designed to induce lower consumption* of electric energy." 18 C.F.R. § 35.28(b)(4) (emphasis added); *see also* Order 745, 2011 WL 890975, at *1 n.2. High retail rates will reduce demand. Conversely, if consumers are paid to reduce demand, prices fall. FERC acknowledges the first case, "price-responsive demand" is a "retail-level" demand response." *See* Order 745, 2011 WL 890975, at *1–3 & n.2 (citing 18 C.F.R. § 35.28(b)(4)). In contrast, FERC dubs a reduction in the consumption of energy in response to incentive payments a "wholesale demand response." *See* FERC Br. 5, 34; *see also* Order 745, 2011 WL 890975, at *1–3 & n.2 (citing 18 C.F.R. § 35.28(b)(4)). The Commission draws this distinction between "wholesale demand response" and "retail demand response" in an attempt to narrow the logical reach of its rule. *See, e.g.*, FERC Br. 5 ("[T]he

Commission has made plain that its focus is narrow and that it addresses only wholesale demand response."); *id.* ("States remain free to authorize and oversee retail demand response programs."); *id.* at 14–15. Yet FERC acknowledges "*wholesale* demand response" is a fiction of its own construction. *See* Oral Arg. Tape, No. 11-1486, at 27:31 (Sept. 23, 2013) (conceding "selling" demand response resources in the wholesale market "is a bit of a fiction"). Demand response resources do not *actually* sell into the market. Demand response does not involve a sale, and the resources "participate" only by declining to act.

As noted, and as the Commission concedes, demand response is not a wholesale sale of electricity; in fact, it is not a sale at all. *See* Order 745, 2011 WL 890975, at *18 ("[T]he Commission does not view demand response as a resale of energy back into the energy market."). Thus, FERC astutely does not rely exclusively on its wholesale jurisdiction under § 201(b)(1) for authority. *See Niagara Mohawk Power Corp.*, 452 F.3d at 828 & n.7.

Instead, FERC argues §§ 205 and 206 grant the agency authority over demand response resources in the wholesale market. These provisions task FERC with ensuring "all rules and regulations *affecting* . . . rates" in connection with the wholesale sale of electric energy are "just and reasonable." 16 U.S.C. § 824d(a) (emphasis added); *see also id.* § 824e(a). Thus, the Commission argues it has jurisdiction over demand response because it "directly affects wholesale rates." FERC Br. 32–34; *see also* Order 745, 2011 WL 890975, at *30.

We agree with the Commission that demand response compensation affects the wholesale market. Because of the direct link between wholesale and retail markets, *compare* FERC Br. 32, *with* Pet'rs Br. 11–14 (describing the "direct"

relationship between wholesale and retail rates), and Reply Br. 12 ("[T]here is undeniably a link between wholesale rates and retail sales"), a change in one market will inevitably beget a change in the other. Reducing retail consumption—through demand response payments—will lower the wholesale price. *See* Oral Arg. Tape, at 33:13. Demand response will also increase system reliability. FERC Br. 33. Because incentive-driven demand response affects the wholesale market in these ways, the Commission argues §§ 205 and 206 are clear grants of agency power to promulgate Order 745.

The Commission's rationale, however, has no limiting principle. Without boundaries, §§ 205 and 206 could ostensibly authorize FERC to regulate any number of areas, including the steel, fuel, and labor markets. FERC proposes the "affecting" jurisdiction can be appropriately limited to "direct participants" in jurisdictional wholesale energy markets. *See* FERC Br. 37. But, as this case demonstrates, the directness of participation may be a function of the richness of the incentives FERC commands. The commission's authority must be cabined by something sturdier than creative characterizations. *See Altamonte Gas Transmission Co. v. FERC*, 92 F.3d 1239, 1248 (D.C. Cir. 1996) (noting FERC cannot "do indirectly what it could not do directly"). The "direct participant" theory also assumes FERC can "lure" non-jurisdictional resources into the wholesale market in the first place to create jurisdiction, *see* Oral Arg. Tape, at 29:52, which is the heart of the Petitioners' challenge.

The limits of §§ 205 and 206 are best determined in the context of the overall statutory scheme. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000). Congressional intent is clearly articulated in § 201's text: FERC's reach "extend[s] only to those matters which are not subject to regulation by the States." 16 U.S.C. § 824(a).

States retain exclusive authority to regulate the retail market. *See Niagara Mohawk Power Corp.*, 452 F.3d at 824. Absent a "clear and specific grant of jurisdiction" elsewhere, *see New York*, 535 U.S. at 22, the agency cannot regulate areas left to the states. The broad "affecting" language of §§ 205 and 206 does not erase the specific limits of § 201.[1] *See generally RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012); sections 205 and 206 do not constitute a "clear and specific grant of jurisdiction." Indeed, the Commission agrees its jurisdiction to regulate practices "affecting" rates does not "trump[] the express limitation on its authority to regulate non-wholesale sales." FERC Br. 34–35. Otherwise, FERC could engage in direct regulation of the retail market whenever the retail market affects the wholesale market, which would render the retail market prohibition useless. *Cf. Morpho Detection, Inc. v. TSA*, 717 F.3d 975,

---

[1] The Dissent focuses extensively on § 201(b)(1), positing that the "jurisdictional issue turns on a rather straightforward question of statutory interpretation: whether a promise to *forgo* consumption of electricity that would have been purchased in the retail electricity market unambiguously constitutes a "sale of electric energy" under section 201(b)(1)." Dissenting Op. at 3. The jurisdictional issue is not quite so narrow. In fact, even the Commission does not characterize the challenge this way and never offers an interpretation of § 201(b)(1), arguing instead that demand response resources are direct participants in wholesale markets. *See* FERC Br. 34–40. Though our review is deferential, even if we reached *Chevron* step two, we could not defer to an interpretation the agency has not offered.

In any event, we do not base our conclusion on the "any other sales" language of § 201(b)(1). Rather, we look to the statutory scheme as a whole and find that demand response, while not necessarily a retail *sale*, is indeed part of the retail *market*, which, as the statute and case law confirm, is exclusively within the state's jurisdiction.

981 (D.C. Cir. 2013) (declining to "adopt a reading that would render the . . . general rule a nullity").

In addition, if FERC's arguments are followed to their logical conclusions, price-responsive demand response—retail demand response in "FERC speak"—would also affect jurisdictional rates in the same way as the type of demand response at issue in FERC's rule here, and FERC's authority regarding demand response would be almost limitless. Although the current rule leaves price-responsive demand untouched, nothing would stop FERC from expanding this regulation and encroaching further on state authority in the future.

Thus, FERC can regulate practices affecting the wholesale market under §§ 205 and 206, provided the Commission is not directly regulating a matter subject to state control, such as the retail market. *Cf. Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 479 (D.C. Cir. 2009) (finding FERC could regulate the installed capacity market under its affecting jurisdiction because FERC did not engage in direct regulation of an area subject to exclusive state control). [2]

---

[2] *Connecticut Department of Public Utility Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009), does not sanction FERC's rule. In *Connecticut*, FERC raised the capacity requirement and incidentally incentivized construction of more generation facilities, which are subject to state control; here, the Commission's rule reaches directly into the retail market to draw retail consumers into its scheme. Here, FERC's incentive is not merely a logical byproduct of the rule; it is the rule. According to the Dissent, "FERC can indirectly incentivize action that it cannot directly require so long as it is otherwise acting within its jurisdiction." Dissenting Op. at 18. We agree *Connecticut* cannot control where FERC has *directly* incentivized action it cannot directly require.

The fact that the Commission is only "luring" the resource to enter the market instead of requiring entry does not undercut the force of Petitioners' challenge. The lure is change of the retail rate. Demand response—simply put—is part of the retail market. It involves *retail* customers, their decision whether to purchase *at retail*, and the levels of *retail* electricity consumption. If FERC had directed ISOs to give a credit to any consumer who reduced its expected use of retail electricity, FERC would be directly regulating the retail rate. At oral argument, the Commission conceded crediting would be an impermissible intrusion into the retail market. *See* Oral Arg. Tape, at 27:15. Ordering an ISO to compensate a consumer for reducing its demand is the same in substance and effect as issuing a credit.[3] Thus, while it is true demand response can occur in two ways—through a response to either price change or incentive payments—nothing about the latter makes it "wholesale." A buyer is a buyer, but a reduction in consumption cannot be a "wholesale sale." FERC's metaphysical distinction between price-responsive demand and incentive-based demand cannot solve its jurisdictional quandary.

Nor does FERC's reliance on a statement of congressional policy from the Energy Policy Act of 2005 save its rule. FERC insists its actions "are consistent with Congressional policy requiring federal level facilitation of demand response, because this final rule is designed to remove barriers to demand response participation in the organized wholesale energy markets." Order 745, 2011 WL 890975, at *30. FERC's reliance on this language is

---

[3] The agency's concession contradicts the Dissent's contention that FERC can regulate demand response here because "non-consumption [does not] constitute an 'other sale,'" Dissenting Op. at 16.

perplexing; if anything, the policy statement supports the opposite conclusion, that Congress intended demand response resources to be regulated by states, as part of the retail market.

The Energy Policy Act of 2005 confirms the national policy of encouraging and facilitating "the deployment of [time-based pricing and other demand response] technology and devices that enable electricity customers to participate in such pricing and demand response systems . . . and [eliminating] unnecessary barriers to demand response participation in energy, capacity and ancillary service markets." Pub. L. No. 109-58, § 1252(f), 119 Stat. 594, 966 (2005). As an initial matter, even if § 1252(f) supports FERC's authority, the Commission cannot rely on the section for an independent source of power. Policy statements like § 1252(f) "are just that—statements of policy. They are not delegations of regulatory authority." *See Comcast Corp. v. FCC*, 600 F.3d 642, 654 (D.C. Cir. 2010); *cf. New York*, 535 U.S. at 22 (finding that a "mere policy declaration . . . cannot nullify a clear and specific grant of jurisdiction"). Thus, the relevant sections of the Energy Policy Act of 2005 can only be used to "help delineate the contours of statutory authority." *Comcast Corp.*, 600 F.3d at 654. And here, those contours do not encompass federal regulation of demand response.

FERC latches onto the language in § 1252(f) requiring elimination of "unnecessary barriers to demand response participation in energy . . . service markets" to support its claim that Order 745 advances congressional policy. *See* FERC Br. 40. In Order 745, however, FERC went far beyond removing barriers to demand response resources. Instead of simply "removing barriers," the rule draws demand response resources into the market and then dictates the compensation providers of such resources must receive.

We think the title of the section is noteworthy: "Federal *Encouragement* of Demand Response Devices." (emphasis added). Pub. L. No. 109-58, § 1252(f), 119 Stat. 594, 966. "To encourage" is not "to regulate." Although the title is "not dispositive of the provision's meaning," "it is not too much to expect that it has something to do with the subject matter" of the section. *See CAISO*, 372 F.3d at 399. And here, "review of the statutory text reveals that [the title] has everything to do with the subject matter." *See id.* The section dictates demand response is to be "encouraged" and "facilitated," not directly regulated as Order 745 proposes.

This is obvious when § 1252(f) is read in tandem with § 1252(e), "Demand Response and Regional Coordination," which declares it the "policy of the United States to encourage States to coordinate, on a regional basis, State energy policies to provide reliable and affordable demand response services to the public." Pub. L. No. 109-58, § 1252(e), 119 Stat. 594, 966. This language underscores that states, not the Commission, regulate demand response. Indeed, § 1252(e) goes on to note FERC should "provide technical assistance to States and regional organizations . . . in . . . developing plans and programs to use demand response to respond to peak demand or emergency needs." *Id.* The Commission is also to prepare an annual report, assessing demand response resources. *Id.* Thus, the Energy Policy Act clarifies FERC's authority over demand response resources is limited: its role is to assist and advise state and regional programs.

Even more importantly, the Energy Policy Act statements show Congress understood the importance of demand response resources to the wholesale market—an importance Petitioners do not dispute. Yet, despite this significant impact on the wholesale market, Congress left regulation of this

aspect of retail demand up to the states, rather than to the federal government.

Because the Federal Power Act unambiguously restricts FERC from regulating the retail market, we need not reach *Chevron* step two. But even if we assumed the statute was ambiguous—as Judge Edwards argues, we would find FERC's construction of it to be unreasonable for the same reasons we find the statute unambiguous. Because FERC's rule entails direct regulation of the retail market—a matter exclusively within state control—it exceeds the Commission's authority.

IV

Alternatively, even if we *assume* FERC had statutory authority to execute the Rule in the first place, Order 745 would still fail because it was arbitrary and capricious.

Under the APA, we must set aside orders that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In particular, "it most emphatically remains the duty of this court to ensure that an agency engage the arguments raised before it," *NorAM Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998), including the arguments of the agency's dissenting commissioners, *Am. Gas Ass'n v FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010); *see also Kamargo Corp. v. FERC*, 852 F.2d 1392, 1398 (D.C. Cir. 1988) ("We recognize that this case presents a difficult problem for the Commission, but we think it has no alternative but to confront the questions raised by the [commissioner's] dissent.").

A review of the record reveals FERC failed to properly consider—and engage—Commissioner Moeller's reasonable

(and persuasive) arguments, reiterating the concerns of Petitioners and other parties, that Order 745 will result in unjust and discriminatory rates. Moeller argued Order 745 "overcompensat[es]" demand response resources because it "requires that demand resource[s] be paid the full LMP *plus* be allowed to retain the savings associated with [the provider's] avoided retail generation cost." Demand Response Compensation in Organized Wholesale Energy Markets: Order on Rehearing and Clarification, 137 FERC ¶ 61,215, 2011 WL 6523756, at *38 (Dec. 15, 2011) [hereinafter Order 745-A] (Moeller, dissenting); *see also* Pet'rs Br. 45–50. The Commission then responded that demand response resources are comparable to generation resources and should therefore receive the same level of compensation. Order 745-A, 2011 WL 6523756, at *14–15. Yet comparable contributions cannot be the reason for equal compensation, when generation resources are incomparably saddled with generation costs. Nor can FERC justify its current overcompensation by pointing to past under-compensation.[4] Although we need not delve now into the dispute among experts, *see, e.g.*, Br. of Leading Economists as *Amicus Curiae* in Support of Pet'rs, the potential windfall to demand response resources seems troubling, and the Commissioner's concerns are certainly valid. Indeed, "overcompensation cannot be just and reasonable," Order 745-A, 2011 WL 6523756, at *38 (Moeller, dissenting), and the Commission has not adequately explained how their system results in just compensation.

---

[4] Similarly, the hope that demand response resources will use the expected windfall for "capital improvements," s*ee* Dissenting Op. at 24, does not respond to Petitioner's concerns that the overcompensation is unfair and discriminatory.

16

The Commission cannot simply talk around the arguments raised before it; reasoned decisionmaking requires more: a "direct response," which FERC failed to provide here. *See Am. Gas Ass'n*, 539 F.3d at 20. Thus, if FERC thinks its jurisdictional struggles are its only concern with Order 745, it is mistaken. We would still vacate the Rule if we engaged the Petitioners' substantive arguments.

V

Ultimately, given Order 745's direct regulation of the retail market, we vacate the rule in its entirety as *ultra vires* agency action.

For the reasons set forth above, we vacate and remand the rulings under review.

*So ordered.*

EDWARDS, *Senior Circuit Judge*, dissenting: Under the Federal Power Act, regulatory authority over the nation's electricity markets is bifurcated between the States and the federal government. In simplified terms, the Federal Energy Regulatory Commission ("FERC" or "Commission") has authority over wholesale electricity sales but not retail electricity sales, with the latter solely subject to State regulation. *See* 16 U.S.C. § 824(a), (b)(1). The consolidated petitions before the court call on us to parse this jurisdictional line between FERC's wholesale jurisdiction and the States' retail jurisdiction – a line which this court and the Supreme Court have recognized is neither neat nor tidy. *See New York v. FERC*, 535 U.S. 1, 16 (2002) ("[T]he landscape of the electric industry has changed since the enactment of the [Federal Power Act], when the electricity universe was 'neatly divided into spheres of retail versus wholesale sales.'" (quoting *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 691 (D.C. Cir. 2000))).

Petitioners challenge Order 745, a rule imposing certain compensation requirements on the administrators of the nation's wholesale electricity markets. *See* Order 745, *Demand Response Compensation in Organized Wholesale Energy Markets*, 134 FERC ¶ 61,187, 2011 WL 890975, at *1 (Mar. 15, 2011). The rule requires these wholesale-market administrators – called Regional Transmission Organizations ("RTOs") and Independent System Operators ("ISOs") – to compensate so-called "demand response resources" at a specified price when certain conditions are met. As relevant here, "demand response resources" are essentially electricity consumers, often bundled together by a third-party aggregator, who agree to reduce their electricity consumption in exchange for incentive payments. *See* 18 C.F.R. § 35.28(b)(4)-(5). The pun scattered throughout the record is that while generators produce megawatts, consumers produce "negawatts." In effect, Order 745 requires that, at certain times, megawatts and negawatts receive the same amount of

payment in wholesale markets, an amount called the "locational marginal price" or "LMP."

Although the challenged rule requires ISOs and RTOs to pay demand response resources a specified compensation (LMP), this requirement is applicable only when two conditions are met: (1) when the demand response resource is capable of balancing supply and demand in the wholesale market, and (2) when compensating the demand response resource is cost-effective under a "net benefits test" prescribed by the rule. The specific mechanics of these conditions and of the "net benefits test" are less important than what they accomplish. The critical point here is that, because of the specified conditions, Order 745 requires compensation of demand response resources *only when* their participation in a wholesale electricity market actually lowers the market-clearing price for wholesale electricity.

With these basics in hand, it is easy to see why FERC stated in its rulemaking that "jurisdiction over demand response is a complex matter that lies at the confluence of state and federal jurisdiction." Order 745, 2011 WL 890975, at *30. On one view, the demand response resources subject to the rule directly affect the *wholesale* price of electricity. That is, the final rule's conditions operate to ensure that *every* negawatt of forgone consumption receiving compensation reduces both the quantity of electricity produced and its wholesale price. Focusing on this direct effect – direct, it bears repeating, because under the rule's conditions *all* demand response resources receiving compensation reduce the market-clearing price – it is easy to conceive of Order 745 as permissibly falling on the *wholesale* side of the wholesale-retail jurisdictional line. On another view, however, the electricity not consumed thanks to the rule's compensation payments would have been consumed first in a retail market.

Focusing on the market in which the consumption *would have occurred* in the first instance, one can conceive of Order 745 as impermissibly falling on the *retail* side of the jurisdictional line.

The task for this court, of course, is not to divine from first principles whether a demand response resource subject to Order 745 is best considered a matter of wholesale or retail electricity regulation. Rather, our task is one of statutory interpretation within the familiar *Chevron* framework. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984); *see also Cal. Indep. Sys. Operator Corp. (CAISO) v. FERC*, 372 F.3d 395, 399-400 (D.C. Cir. 2004). The Commission has interpreted the Federal Power Act to permit it to issue Order 745. And it falls to this court to determine whether the Act unambiguously "sp[eaks] to the precise question," 467 U.S. at 842 (*Chevron* step one), and, if not, whether the Commission's interpretation is a permissible construction of the statute, *id.* at 843 (*Chevron* step two).

Though the rule and its operation are highly technical, the primary jurisdictional issue raised in these consolidated petitions turns on a rather straightforward question of statutory interpretation: whether a promise to *forgo* consumption of electricity that would have been purchased in a retail electricity market unambiguously constitutes a "sale of electric energy" under section 201(b)(1) of the Federal Power Act. 16 U.S.C. § 824(b)(1). If so, the Commission lacked jurisdiction to issue Order 745 because section 201(b)(1) of the Act states, in relevant part, that the "provisions of this subchapter shall apply . . . to the sale of electric energy at *wholesale* in interstate commerce, but . . . *shall not apply to any other sale of electric energy.*" *Id.* (emphasis added).

The statute, to my mind, is ambiguous regarding whether forgone consumption constitutes a "sale" under section 201(b)(1). Because of this ambiguity, the Act is also ambiguous as to whether a rule requiring administrators of wholesale markets to pay a specified level of compensation for such forgone consumption constitutes "direct regulation" of retail sales that would contravene the limitations of section 201. *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481-82 (D.C. Cir. 2009) (holding that FERC's approval of an Installed Capacity Requirement was not "*direct regulation*" of electrical generation facilities and, thus, did not violate section 201 (emphasis added)). Because the Act is ambiguous regarding FERC's authority to require ISOs and RTOs to pay demand response resources, we are obliged to defer under *Chevron* to the Commission's permissible construction of "a statutory ambiguity that concerns the scope of the agency's statutory authority (that is, its jurisdiction)." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868, 1874-75 (2013).

Absent an affirmative limitation under section 201, there is no doubt that demand response participation in wholesale markets and the ISOs' and RTOs' market rules concerning such participation constitute "practice[s] . . . affecting" wholesale rates under section 206 of the Act. 16 U.S.C. § 824e(a); *see also id.* § 824d(a) (providing that "all rules and regulations affecting or pertaining to [wholesale] rates or charges shall be just and reasonable"). Petitioners' arguments to the contrary ignore the direct effect that the ISOs' and RTOs' market rules have on wholesale electricity rates squarely within FERC's jurisdiction. The Commission has authority to "determine the just and reasonable . . . practice" by setting a level of compensation for demand response resources that, in its expert judgment, will ensure that the rates charged in wholesale electricity markets are "just and

5

reasonable." *Id.* § 824e(a). It was therefore reasonable for the Commission to conclude that it could issue Order 745 under the Act's "affecting" jurisdiction. *See id.* §§ 824e(a), 824d(a).

In addition to challenging FERC's jurisdiction, Petitioners argue that its decision to mandate compensation equal to the LMP was arbitrary and capricious. Petitioners believe that the LMP overcompensates demand response resources since they also realize savings from not having to purchase retail electricity. The Commission, Petitioners insist, should have set the compensation level at the LMP minus the retail cost of the forgone electricity. But the Commission's decision in this regard was reasonable and adequately explained.

For these reasons, explained below in greater detail, I respectfully dissent.

## I.  BACKGROUND

### A.  *The Problem*

To understand this case, one must appreciate the scope and significance of the problem FERC sought to address in Order 745. Three characteristics of the nation's electricity market go a long way toward framing the problem. *First*, electricity, unlike most commodities, cannot be stored for later use. There must instead be a continual, contemporaneous matching of supply to meet current electricity demand. *Second*, not all power plants are created equal: some are efficient and cheap; others, inefficient and expensive. *Third*, most retail consumers are charged a fixed price for electricity that does not adjust in the moment to temporary spikes in the cost of producing electricity.

The first two characteristics, in tandem, cause significant fluctuations in the cost of supplying electricity at different times of day. During periods of regular electricity consumption, only the efficient and cheap power plants need be deployed. But at hours of peak usage (*e.g.*, a summer afternoon in Washington, D.C. when countless air conditioners toil against the humidity and heat), the suppliers of electricity must marshal the least efficient and most costly power plants to match the soaring demand for electricity. It is because electricity cannot be efficiently stored that these periods of peak demand must be met with new generation and not stockpiled supply.

In a perfect market, or even in a well-functioning market, the skyrocketing cost of producing additional electricity at hours of peak usage would be reflected in temporarily higher prices charged to consumers. In turn, this increased price would reduce the megawatts of electricity demanded, as some individuals and businesses would, for example, turn off their air conditioners to save money. The market would thereby reach an efficient equilibrium.

But here is where the third characteristic of electricity markets comes in. Retail electricity prices are generally regulated to remain constant over longer periods of time. That is, consumers do not pay different amounts during different hours of the day, notwithstanding the sharply vacillating cost of producing electricity. Electricity demand thus does not respond to time-sensitive price signals. As a result, there are times when people and businesses consume electricity that costs more to produce than it is worth to them to consume. This is inefficient.

Wholesale electricity markets, which are under FERC's jurisdiction, suffer the same inefficiency. Since retail demand

is not price-responsive, the aggregate amount of electricity demanded in the wholesale market by the entities that serve retail customers is also uncoupled from the time-specific price of supplying electricity. In economic terms, the demand for electricity in the wholesale market is inelastic. *See* Order 745-A, *Demand Response Compensation in Organized Wholesale Energy Markets*, 137 FERC ¶ 61,215, 2011 WL 6523756, at *9 (Dec. 15, 2011).

The Commission recognizes the problem. As it observed in its order denying requests for rehearing of Order 745,

> [a] properly functioning market should reflect both the willingness of sellers to sell at a price and the willingness of buyers to purchase at a price. In an RTO- or ISO-run market, however, buyers are generally unable to directly express their willingness to pay for a product at the price offered. As discussed later, RTOs and ISOs cannot isolate individual buyers' willingness to pay which results in extremely inelastic demand.

*Id.*; *see also* Order 745, 2011 WL 890975, at *1 ("[A] market functions effectively *only when* both supply and demand can meaningfully participate." (emphasis added)).

## B. *FERC's Solution*

Having identified a problem in the wholesale electricity market, the Commission has a statutory obligation to do what it can to fix it. That is because FERC is charged under the Federal Power Act with ensuring that wholesale electricity rates are "just and reasonable." 16 U.S.C. §§ 824d(a), 824e(a). It must ensure that all "rates and charges made, demanded, or received by any public utility for *or in connection with* the . . . sale of electric energy subject to the

jurisdiction of the Commission" are "just and reasonable." *Id.* § 824d(a) (emphasis added); *see also id.* § 824(a). And when FERC determines that a "practice . . . affecting" such a rate is unjust or unreasonable, it must itself determine and fix "the just and reasonable . . . practice . . . to be thereafter observed." *Id.* § 824e(a).

Consistent with its statutory duty and in view of the market distortions caused by inelastic wholesale demand, the Commission has initiated a series of reforms to open wholesale markets to "demand response resources." For our purposes, "demand response resources" are resources that are capable of reducing "the consumption of electric energy by customers from their expected consumption in response . . . to incentive payments designed to induce lower consumption of electric energy." 18 C.F.R. § 35.28(b)(4)-(5). Put simply, demand response resources agree not to purchase electricity in exchange for payment.

The basic premise of FERC's demand-response reforms is that there are two ways that wholesale-market administrators (*i.e.*, ISOs and RTOs) can balance wholesale supply and demand: by increasing the supply of electricity *or* by decreasing the demand for it. *See* Order 745-A, 2011 WL 6523756, at *14. An ISO or RTO reduces wholesale demand when it pays a demand response resource because that resource will forgo electricity consumption in the retail market, which, in turn, will lead to fewer megawatts of electricity being demanded in the aggregate in that ISO's or RTO's wholesale market. At certain times (*e.g.*, summer afternoons in Washington, D.C.), paying incentive payments to induce consumers not to consume electricity may be cheaper than paying generators to produce more power; negawatts, in such circumstances, are the cheaper alternative. And because, functionally, there is little difference to

wholesale-market administrators between a megawatt and a negawatt (both assist equally in the administrator's task of bringing wholesale demand and supply into equipoise), demand response resources are capable of competing directly with traditional generation resources so long as the appropriate market rules are in place.

For some years now, FERC has recognized that the direct participation of demand response resources in wholesale markets improves the functioning of these markets in several respects. First, it lowers wholesale prices because "lower demand means a lower wholesale price." Order 719-A, *Wholesale Competition in Regions with Organized Electric Markets*, 128 FERC ¶ 61,059, 2009 WL 2115220, at \*\*12 (July 16, 2009). Second, it mitigates the market power of suppliers of electricity because they have to compete with demand response resources and adjust their bidding strategy accordingly. *See id.* ("[T]he more demand response is able to reduce peak prices, the more downward pressure it places on generator bidding strategies by increasing the risk to a supplier that it will not be dispatched if it bids a price that is too high."). Third, demand response "enhances system reliability," for example, by "reducing electricity demand at critical times (e.g., when a generator or a transmission line unexpectedly fails)." *Id.* at \*\*12 & n.76; *see also* Order 745-A, 2011 WL 6523756, at \*6 ("[D]emand response generally can be dispatched by the [ISO or RTO] with a minimal notice period, helping to balance the electric system in the event that an unexpected contingency occurs.").

The benefits of demand response participating in wholesale markets are beyond reproach. Commissioner Moeller, who dissented in Order 745, put it best:

> While the merits of various methods for compensating demand response were discussed at length in the course of this rulemaking, nowhere did I review any comment or hear any testimony that questioned the benefit of having demand response resources participate in the organized wholesale energy markets. *On this point, there is no debate*. The fact is that demand response plays a very important role in these markets by providing significant economic, reliability, and other market-related benefits.

Order 745, 2011 WL 890975, at \*34 (emphasis added) (Moeller, dissenting).

It is no surprise, then, that FERC has initiated a series of reforms to open up its markets to demand response, on the theory that doing so helps to ensure "just and reasonable" wholesale rates by improving how these markets function in the three ways just mentioned. *See* Order 890, *Preventing Undue Discrimination and Preference in Transmission Service*, 72 Fed. Reg. 12,226, 12,378 (Mar. 15, 2007); Order 719, *Wholesale Competition in Regions with Organized Electric Markets*, 73 Fed. Reg. 64,100 (Oct. 28, 2008); *see also* Br. for Resp't at 11-13 (providing overview of these rulemakings); *id.* at 12 (noting that, before Order 719, FERC had approved proposals by various ISOs and RTOs "to allow demand response participation in their ancillary services markets" (citations omitted)).

In particular, in Order 719 FERC required ISOs and RTOs to "accept bids from demand response resources in RTOs' and ISOs' markets for certain ancillary services on a basis comparable to other resources" and, in certain circumstances, to "permit an aggregator of retail customers . . . to bid demand response on behalf of retail customers

directly into the organized energy market." Order 719-A, 2009 WL 2115220, at **1. But FERC placed an important condition on this requirement; ISOs and RTOs were required to accept bids from demand response "unless not permitted by the laws or regulations of the relevant electric retail regulatory authority." 18 C.F.R. § 35.28(g)(1)(i)(A), (iii); Order 719-A, 2009 WL 2115220, at **13. Finally, recognizing that "further reforms may be necessary to eliminate barriers to demand response in the future," FERC further ordered ISOs and RTOs to "assess and report on any remaining barriers to comparable treatment of demand response resources that are within the Commission's jurisdiction." Order 719-A, 2009 WL 2115220, at **1.

And further reforms were indeed necessary. Prior to issuing Order 745, ISOs and RTOs had differing practices concerning the level of compensation to be paid to demand response resources in their markets. Order 745, 2011 WL 890975, at *4. The Commission found that many ISOs and RTOs undercompensated demand response resources in certain circumstances. *See id.* at *16. It reached this finding in light of existing barriers to demand response participation in wholesale markets, including "the lack of market incentives to invest in enabling technologies that would allow electric customers and aggregators of retail customers to see and respond to changes in marginal costs of providing electric service as those costs change." *Id.*; *see also id.* ("[T]he inadequate compensation mechanisms in place today in wholesale energy markets fail to induce sufficient investment in demand response resource infrastructure and expertise that could lead to adequate levels of demand response procurement. *Without sufficient investment in the development of demand response, demand response resources simply cannot be procured because they do not yet exist as resources.* Such investment will not occur so long as

compensation undervalues demand response resources." (emphasis added) (quoting a commenter)).

Order 745 sought to correct the undercompensation problem by mandating that ISOs and RTOs pay demand response resources the same market price that they pay to generators, *i.e.*, LMP. But it limited this compensation requirement to circumstances where two specific conditions are met. LMP-compensation would be required only when (1) "the demand response resource [is] able to displace a generation resource in a manner that serves the RTO or ISO in balancing supply and demand," and (2) "the payment of LMP . . . [is] cost-effective, as determined by [a] net benefits test." *Id.* at *13; *see also* 18 C.F.R. § 35.28(g)(1)(v)(A).

FERC understood that it had authority to correct the undercompensation problem because, in the absence of adequate compensation, too few demand response resources affirmatively bid into the wholesale markets. And such participation is necessary for the market to function rationally and reach "just and reasonable" rates. As FERC stated:

> We find, based on the record here that, when a demand response resource has the capability to balance supply and demand as an alternative to a generation resource, and when . . . paying LMP to that demand response resource is shown to be cost-effective as determined by the net benefits test described herein, payment by an RTO or ISO of compensation other than the LMP is unjust and unreasonable. *When these conditions are met, we find that payment of LMP to these resources will result in just and reasonable rates for ratepayers.*

Order 745, 2011 WL 890975, at *13 (emphasis added).

## II. ANALYSIS

### A. *Jurisdiction*

Petitioners argue that Order 745 is "in excess" of FERC's "statutory jurisdiction." Br. of Pet'rs Elec. Power Supply Ass'n, et al. ("Br. of Pet'rs") at 27 (citing 5 U.S.C. § 706(2)(C)). We evaluate this contention under *Chevron* and defer to FERC's permissible construction of its authorizing statute, regardless of "whether the interpretive question presented is 'jurisdictional.'" *City of Arlington*, 133 S. Ct. at 1874-75; *see also Connecticut*, 569 F.3d at 481. The proper question is thus whether the Act *unambiguously* forecloses FERC from issuing Order 745 under its "affecting" jurisdiction. *See* 16 U.S.C. § 824e; *Chevron*, 467 U.S. at 842.

FERC's explanation of its jurisdiction under the Federal Power Act is straightforward and sensible. FERC has the authority and responsibility to correct any "practice . . . affecting" wholesale electricity rates that the Commission determines to be "unjust" or "unreasonable." 16 U.S.C. § 824e(a); *see also id.* § 824d(a). In its view, the ISOs' and RTOs' rules governing the participation of demand response resources in the nation's wholesale electricity markets are "practices affecting [wholesale electricity] rates." Order 745-A, 2011 WL 6523756, at *10 (quoting 16 U.S.C. §§ 824d, 824e). That is, an ISO's or RTO's market rules governing how a demand response resource may compete in its wholesale market, including the terms by which a demand response resource is to be compensated in the market, are "practices affecting" that wholesale market's rates for electricity. And FERC has determined that an ISO's or RTO's "practice" is unjust and unreasonable to the degree that it inadequately compensates demand response resources capable of supplanting more expensive generation resources. *See id.* at

*36. As explained above, FERC has found that demand response improves the functioning of wholesale markets by (1) lowering the wholesale price of electricity, (2) exerting downward pressure on generators' market power, and (3) enhancing system reliability.

FERC's explanation is consistent with our case law. In *Connecticut*, we considered whether FERC has jurisdiction to review an ISO's capacity charges. 569 F.3d at 478-79. Capacity is not electricity but the ability to produce it when needed, and in *Connecticut* the ISO had established a market where capacity providers – generators, prospective generators, and demand response resources – competitively bid to meet the ISO's capacity needs three years in the future. *Id.* at 479-81. Generation, like retail sales, is expressly the domain of State regulation under section 201, 16 U.S.C. § 824(b)(1), and the petitioners argued that by increasing the overall capacity requirement the ISO was improperly requiring the installation of new generation resources. 569 F.3d at 481. We disagreed and held that FERC had "affecting" jurisdiction under section 206 because "capacity decisions . . . affect FERC-jurisdictional transmission rates for that system without directly implicating generation facilities." *Id.* at 484. That the capacity requirement helped to "find the right price" was enough of an effect to satisfy section 206. *Id.* at 485.

Petitioners' specific arguments against FERC's exercising jurisdiction are unpersuasive. *First*, Petitioners note that section 201 of the Act establishes a clear jurisdictional line between "the sale of electric energy at wholesale in interstate commerce," which is properly the subject of FERC's jurisdiction, and "any other sale of electric energy." Br. of Pet'rs at 27-28 (citing 16 U.S.C. § 824(a), (b)(1)). According to Petitioners, the Commission has transgressed this line because it "has ordered ISOs and RTOs

to pay *retail customers* for reducing their *retail purchases* of electricity." *Id.* at 28.

But this argument mischaracterizes the rule and papers over a key ambiguity. First, the mischaracterization: Petitioners are wrong inasmuch as they imply that FERC requires *all* ISOs and RTOs to pay demand response resources a minimum level of compensation (LMP). The compensation requirement promulgated in Order 745 does not apply unless an ISO or RTO "has a tariff provision permitting demand response resources to participate as a resource in the energy market." 18 C.F.R. § 35.28(g)(1)(v). And the regulation's requirement that ISOs and RTOs accept bids from demand response resources comes with a key caveat: the requirement applies "unless not permitted by the laws or regulations of the relevant electric retail regulatory authority." *Id.* § 35.28(g)(1)(i)(A); *see also id.* § 35.28(g)(1)(iii). In other words, there is a carve-out from the compensation requirement for ISOs and RTOs in States where local regulatory law stands in the way. Thus, the Order preserves State regulation of retail markets. This is hardly the stuff of grand agency overreach.

More fundamentally, Petitioners' argument founders on a statutory ambiguity they ignore. Section 201 makes clear that FERC may regulate "the sale of electric energy at wholesale in interstate commerce" but not "any other *sale* of electric energy." 16 U.S.C. § 824(b)(1) (emphasis added). The demand response at issue here is forgone consumption, which is no "sale" at all. Perhaps the phrase "any other sale of electric energy" could be interpreted to include *non*-sales that *would have been* sales in the retail market, but it certainly does not *require* such a reading. It is reasonable to categorize demand response as neither a retail sale nor wholesale sale under the Federal Power Act. And on this understanding,

section 201 "says nothing about" FERC's power to review compensation rates for demand response in wholesale electricity markets. *Connecticut*, 569 F.3d at 483.

Nor is Petitioners' argument under section 201 made any stronger by reference to subsection (a). This prefatory subsection states that while "Federal regulation . . . of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest," federal regulation should "extend only to those matters which are not subject to regulation by the States." 16 U.S.C. § 824(a). But the Supreme Court has made clear that "the precise reserved state powers language in § 201(a)" is a "*mere policy declaration* that cannot nullify a clear and specific grant of jurisdiction, *even if the particular grant seems inconsistent with the broadly expressed purpose*." *New York*, 535 U.S. at 22 (emphasis added) (internal quotation marks omitted). And, as I discuss below, section 206's specific grant of "affecting" jurisdiction quite clearly authorized FERC to issue Order 745.

The most that can be said of section 201 is that it commits regulation of retail *sales* to the States and regulation of wholesale *sales* to the Commission. And while it is true that the forgone consumption would have been purchased in the first instance in the retail market, it does not follow from this fact that non-consumption constitutes an "other sale" under section 201(b). There was no sale, period. And the statute does not give a clear indication that Congress intended to foreclose FERC from regulating non-sales that have a direct effect on the wholesale markets under FERC's jurisdiction.

Even assuming that the Federal Power Act requires demand response resources to be considered inextricably part

of retail "sales" subject solely to State regulation, Order 745 does not engage in the type of "direct regulation" that would violate section 201. *See Connecticut*, 569 F.3d at 481. Order 745 does not require anything of retail electricity consumers and leaves it to the States to decide whether to permit demand response. All Order 745 says is that *if* a State's laws permit demand response to be bid into electricity markets, and *if* a demand response resource affirmatively decides to participate in an ISO's or RTO's wholesale electricity market, and *if* that demand response resource would in a particular circumstance allow the ISO or RTO to balance wholesale supply and demand, and *if* paying that demand resource would be a net benefit to the system, *then* the ISO or RTO must pay that resource the LMP. That is it. This requirement will no doubt affect how much electricity is consumed by a small subset of retail consumers who elect to participate as demand response resources *in wholesale markets*. But that fact does not render Order 745 "direct regulation" of the retail market. Authority over retail rates and over whether to permit demand response remains vested solely in the States.

In this respect, Order 745 is similar to the capacity rule in *Connecticut* that we found did not directly regulate generation facilities. 569 F.3d at 482. Even though increasing the capacity requirement incentivized the procurement of additional resources, including new generation facilities, to meet the higher requirement, we recognized that States retained their ultimate authority over the construction of new generation facilities. *Id.* at 481-82. And because the capacity requirements could be met in other ways aside from building new generators (*e.g.*, through demand response or capacity contracts), it was irrelevant that "public utilities . . . overwhelmingly responded to [increased capacity requirements] by choosing to allow construction of new facilities over other alternatives." *Id.* at 482. The lesson of

*Connecticut* is that FERC can indirectly incentivize action that it cannot directly require so long as it is otherwise acting within its jurisdiction – and that doing so does not constitute impermissible direct regulation of an area reserved to the States. So too here: Order 745 may encourage more demand response, but States retain the ultimate authority to approve the practice.

*Second*, Petitioners argue that the FERC's "affecting" jurisdiction under sections 205 and 206 of the Act "does not extend so far as to allow the Commission to regulate directly the retail services that are expressly carved out from the scope of its jurisdiction." Br. of Pet'rs at 30-31 (citing 16 U.S.C. § 824(a), (b)(1)). To a large degree, this argument simply rehashes Petitioners' erroneous reading of section 201 and fails for the reasons just described. Demand response resources are promises to *forgo* consumption of electricity and therefore are not retail "sales." This is not changed by the fact that forgone consumption would have taken place in the first instance in a retail market. Because of this, the Commission's asserting "affecting" jurisdiction over demand response does not, as Petitioners suggest, "nullify[]" a limitation set forth in section 201. *Id.* at 32.

To be sure, section 206 cannot be read to displace *unambiguous* jurisdictional limits imposed by section 201(b). Suppose, for example, that FERC issued a rule requiring ISOs and RTOs to condition all wholesale sales of electricity on load-serving entities' agreeing to charge retail customers with real-time pricing that adjusted hourly for variations in the cost of producing electricity. Such a rule would unambiguously regulate each retail "sale" because it would mandate a particular form of compensation for *actual* – not counterfactual – retail sales. Thus, while price-responsive retail pricing would no doubt "affect" the wholesale rate,

FERC could not claim jurisdiction under sections 205 and 206 because the subchapter which includes these sections "shall not apply to any other *sale* of electric energy." 16 U.S.C. § 824(b)(1) (emphasis added). This example plainly differs from the present case because demand response resources are forgone sales or non-sales, and therefore it is at best ambiguous whether the limitation in section 201(b) applies. *See Connecticut*, 569 F.3d at 483 ("Section 201 prohibits the Commission from regulating generation facilities but says nothing about its power to review the capacity requirements that an [ISO] imposes on member [utilities].").

To bolster their case, Petitioners invoke the specter of limitless federal authority if FERC is permitted to exercise "affecting" jurisdiction to issue Order 745. They caution that "the Commission's expansive interpretation of its 'affecting' jurisdiction would allow it to regulate any number of activities – such as the purchase or sale of steel, fuel, labor, and other inputs influencing the cost to generate or transmit electricity – merely by redefining the activities as 'practices' that affect wholesale rates." Br. of Pet'rs at 33.

This argument cannot carry the day because it ignores at least two important limits. It first ignores section 201's limit proscribing any "direct regulation" of retail sales (which would bar the hypothetical rule, discussed above, in which FERC tries to mandate that retail sales have dynamic, time-responsive pricing). *See Connecticut*, 569 F.3d at 481. It also ignores the limitations we announced in *CAISO*, 372 F.3d 395. There, we held that FERC exceeded its jurisdiction when it replaced the board members of an ISO on the theory that the composition of the ISO's board was a "practice . . . affecting [a] rate" under section 206(a). *Id.* at 399. We held that "section 206's empowering of the Commission to assess the justness and reasonableness of practices affecting rates of

electric utilities is limited to those methods or ways of doing things on the part of the utility that *directly affect* the rate or are closely related to the rate, not all those remote things beyond the rate structure that might in some sense indirectly or ultimately do so." *Id.* at 403 (emphasis added).

These limits foreclose the parade of horribles marshaled by Petitioners. Like replacing the ISO's board of directors in *CAISO*, FERC could not, consistent with Circuit precedent, regulate markets in steel, fuel, labor, and other inputs for generating electricity, which constitute "remote things beyond the rate structure that might in some sense indirectly or ultimately" affect the wholesale rate of electricity. *Id.*; *see also Calpine Corp. v. FERC*, 702 F.3d 41, 47 (D.C. Cir. 2012) (affirming FERC's determination that it lacked "affecting" jurisdiction over station power, which is a necessary input to energy production, because there was not a "sufficient nexus with wholesale transactions" (internal quotation marks omitted) (citing *City of Cleveland v. FERC*, 773 F.2d 1368, 1376 (D.C. Cir. 1985))); *City of Cleveland*, 773 F.2d at 1376 ("[T]here is an infinitude of practices affecting rates and service. The statutory directive must reasonably be read to require the recitation of only those practices *that affect rates and service significantly* . . . ." (emphasis added)).

Order 745 passes the *CAISO* test quite comfortably because the demand response resources subject to the rule have a quintessentially "direct" effect on wholesale rates. The rule's compensation requirement applies *only when* an ISO or RTO can use the demand response resource in lieu of a generation resource to balance supply and demand, *and only when* paying a demand response resource is cost-effective under the rule's net benefits test. 18 C.F.R. § 35.28(g)(1)(v)(A). Order 745 thus does not purport to regulate demand response writ large; its compensation

requirement applies only when the demand response *by definition* alters the wholesale electricity price. That is about as "direct" an effect and as clear a "nexus" with the wholesale transaction as can be imagined. *See Calpine Corp.*, 702 F.3d at 47; *CAISO*, 372 F.3d at 403; *City of Cleveland*, 773 F.2d at 1376. There can be little doubt that FERC has the authority to review the justness and reasonableness of rates that are so closely connected with the healthy functioning of its jurisdictional markets; this, as we said in *Connecticut*, is the "heartland of the Commission's section 206 jurisdiction." 569 F.3d at 483.

*Third*, Petitioners argue that the Commission's orders exceed its jurisdiction because "they unreasonably interfere with existing state and local programs addressing retail customer 'demand response.'" Br. of Pet'rs at 41. Any such effect, however, is merely incidental. As the Commission correctly observed, Order 745 "does not directly affect retail-level demand response programs, nor does it require that demand response resources offer into the wholesale market only. Indeed, the organized wholesale energy markets can and do operate simultaneously with retail-level programs . . . ." Order 745-A, 2011 WL 6523756, at *19. FERC's reforms in Order 745 run on a parallel track with State-level reforms. And to the degree that FERC's reforms incidentally affect parallel State-level initiatives, that does not render FERC's actions improper. *See Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277, 1280 (D.C. Cir. 2007) (observing that FERC's authority to act within its statutory scope of jurisdiction "may, of course, impinge as a practical matter on the behavior of non-jurisdictional" entities).

\* \* \*

To summarize: FERC's jurisdiction turns on two issues: (1) whether demand response is a retail "sale" or is otherwise unambiguously committed to State regulation under the Federal Power Act, and (2) whether sections 205 and 206 clearly grant jurisdiction to FERC to regulate how wholesale-market administrators compensate demand response resources that "directly affect" wholesale prices. Unless we inject quasi-philosophy into our *Chevron* analysis (what is the sound of one hand clapping? what is the true nature of a sale that was never made? of megawatts never consumed?), I think it clear that the Federal Power Act does not precisely address the first question; forgone consumption is not unambiguously a "sale," nor does the statute dictate that demand response be treated solely as a matter of retail regulation. And the second question is resolved, in my view, by the terms of Order 745 which narrowly apply *only* to demand response resources that by definition directly affect the wholesale rates of electricity. This falls squarely within the Commission's "affecting" jurisdiction. *See* 16 U.S.C. §§ 824d, 824e. The proper course for this court is to defer to the Commission's well-reasoned and permissible interpretation of its authority under the statute.

## B. *Level of Compensation*

Petitioners also argue that Order 745 is arbitrary and capricious under 5 U.S.C. § 706(2)(A). In reviewing such claims, we consider whether FERC "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). We also afford significant deference to FERC in light of the highly technical regulatory landscape that is its purview. Indeed, "the Commission enjoys

broad discretion to invoke its expertise in balancing competing interests and drawing administrative lines." *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010). And we "afford great deference to the Commission" in cases involving ratemaking decisions as the "statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition." *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 532 (2008). Finally, to the extent that the Commission bases its actions on factual findings, such findings are conclusive if supported by substantial evidence. 16 U.S.C. § 825*l*(b).

Petitioners' chief complaint is that Order 745 sets the required compensation level for demand response at the LMP (recall: locational marginal price). LMP equals "the marginal value of an increase in supply or a reduction in consumption at each node within" an ISO's or RTO's wholesale market, and is the compensation generation resources generally receive. Order 745-A, 2011 WL 6523756, at \*20. Petitioners complain that demand response resources already get the benefit of the forgone expense of retail electricity (abbreviated in the record as "G"). Therefore, Petitioners contend that, under FERC's rule, demand response resources effectively receive a "double payment": LMP plus G. Br. of Pet'rs at 47. According to Petitioners, requiring LMP compensation thus results in unjust and discriminatory overcompensation of demand response resources. *Id.* at 45-50; *see also* Order 745-A, 2011 WL 6523756, \*38 (Moeller, dissenting).

It is of course true, as the majority observes, that FERC is "bounded by the requirements of reasoned decisionmaking." *Am. Gas Ass'n*, 593 F.3d at 19. Therefore, FERC was required to provide a "direct response" to the Petitioners' and the dissenting Commissioner's concerns about

overcompensation. *Id.* at 20. This is precisely what the Commission did in carefully explaining how Order 745's setting compensation at the LMP was neither discriminatory nor unjust.

To begin with, FERC provided a thorough explanation for why compensating demand response at the LMP (and not LMP - G) was neither unjust nor over-compensatory. It explained that such compensation was necessary to encourage an adequate level of demand response participation in wholesale markets in light of existing market barriers. *See* Order 745-A, 2011 WL 6523756, at *15 (noting that Petitioners "fail to acknowledge the market imperfections caused by the existing barriers to demand response"). That last part – the market barriers – is the key. The Commission has identified numerous barriers preventing adequate participation of demand response in wholesale markets. Order 745, 2011 WL 890975, at *16 & n.122 (citing study). Indeed, citing record evidence, the Commission explained that "the inadequate compensation mechanisms in place today in wholesale energy markets fail to induce sufficient investment in demand response resource infrastructure and expertise that could lead to adequate levels of demand response procurement." *Id.* at *16 (quoting a commenter). FERC further explained that "a lack of incentives to invest in enabling technologies can be addressed by making additional investment resources available to market participants" and that paying LMP "to demand response will provide the proper level of investment resources available for capital improvements." Order 745-A, 2011 WL 6523756, at *16. In view of these barriers, and the value of demand response participation to ensuring "just and reasonable" wholesale rates, the Commission concluded that LMP was the appropriate level of compensation.

FERC sums it up well:

> The Commission acknowledged that noted experts differed on whether paying LMP in the current circumstances facing the wholesale electric market is a reasonable price. In determining that LMP is the just and reasonable price to pay for demand response, the Commission examined some of the previously recognized barriers to demand response that exist in current wholesale markets. These barriers create an inelastic demand curve in the wholesale energy market that results in higher wholesale prices than would be observed if the demand side of the market were fully developed. The Commission found that paying LMP when cost-effective may help remove these barriers to entry of potential demand response resources, and, thereby, help move prices closer to the levels that would result if all demand could respond to the marginal price of energy.

*Id.* at *17. This is a "direct response" to the points raised by the Petitioners. *Am. Gas Ass'n*, 593 F.3d at 20.

With respect to the argument that utilizing the LMP is somehow discriminatory because incomparable resources are paid comparable amounts, the Commission offered reasonable grounds for treating demand response as comparable to generation resources. The Commission observed that, from the perspective of an ISO or RTO, a demand response resource was comparable to a generation resource inasmuch as demand response is equally capable of balancing wholesale supply and demand. Order 745-A, 2011 WL 6523756, at *14. This is not the sum total of the explanation, however. In the same section of its order, the Commission explained that "examining cost avoidance by demand response resources is

not consistent with the treatment of generation. In the absence of market power concerns, the Commission generally does not examine each of the costs of production for individual resources participating as supply resources in the organized wholesale electricity markets." *Id.* at \*17; *see also id.* at \*21. FERC continued: "we note that certain generators may receive benefits or savings in the form of credits or in other forms. In these cases, the generators realize a value of LMP plus the credit or savings, but ISOs or RTOs do not take such benefits or savings into account in determining how much to pay those resources." *Id.* at \*17 n.122. The point is that the comparability of compensation is assessed without regard to outside costs and credits; just as two generators are both compensated at the LMP even though only one might be receiving a tax credit for producing energy, so too with comparing demand response resources to generation resources. This was clearly explained, and it is reasonable.

This court has no business second-guessing the Commission's judgment on the level of compensation. *See La. Pub. Serv. Comm'n v. FERC*, 551 F.3d 1042, 1045 (D.C. Cir. 2008) (noting that "[w]here the subject of our review is . . . a predictive judgment by FERC about the effects of a proposed remedy . . . , our deference is at its zenith"); *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004, 1009 (D.C. Cir. 2005) (holding that "more than second-guessing close judgment calls is required to show that a rate order is arbitrary and capricious" (citation omitted)); *Envtl. Action, Inc. v. FERC*, 939 F.2d 1057, 1064 (D.C. Cir. 1991) ("[I]t is within the scope of the agency's expertise to make . . . a prediction about the market it regulates, and a reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view.").

Whatever policy disagreements one might have with Order 745's decision to compensate demand response resources at the LMP (and there are legitimate disagreements to be had), the rule does not fail for want of reasoned decisionmaking. FERC's judgment is owed deference because it has put forth a reasonable multi-step explanation of its decision to mandate LMP compensation. First, responsive demand is a necessary component of a well-functioning wholesale market, and FERC understood that its obligation to ensure just and reasonable rates required it to facilitate an adequate level of demand response participation in its jurisdictional markets. *See* Order 745, 2011 WL 890975, at *16. Second, FERC concluded that market barriers were inhibiting an adequate level of demand response participation. *See id.* Third, FERC concluded that mandating LMP would provide the proper incentives for demand response resources to overcome these barriers to participation in the wholesale market. *See id.*; *see also* Notice of Proposed Rulemaking, *Demand Response Compensation in Organized Wholesale Energy Markets*, *reprinted in* J.A. 208, 220-21 (stating that "demand response resources react correspondingly to increases or decreases in payment" and citing study showing that switching from LMP to LMP - G compensation resulted in a 36.8% decrease in demand response participation in the ISO being studied).

## III. CONCLUSION

FERC had jurisdiction to issue Order 745 because demand response is not unambiguously a matter of retail regulation under the Federal Power Act, and because the demand response resources subject to the rule directly affect wholesale electricity prices. *See* 16 U.S.C. §§ 824d, 824e. And the Commission's decision to require compensation equal to the LMP, rather than LMP - G, was not arbitrary or

capricious. The majority disagrees on both points. The unfortunate consequence is that a promising rule of national significance – promulgated by the agency that has been authorized by Congress to address the matters in issue – is laid aside on grounds that I think are inconsistent with the statute, at odds with applicable precedent, and impossible to square with our limited scope of review. I therefore respectfully dissent.